**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JOEL MOSQUERA, derivatively on behalf of PINTEREST, INC., | |
| Plaintiff, | C.A. No. |
| vs. | |
| BENJAMIN SILBERMANN, TODD MORGENFELD, JEFFREY JORDAN, LESLIE J. KILGORE, JEREMY S. LEVINE, GOKUL RAJARAM, FREDRIC G. REYNOLDS, EVAN SHARP, and MICHELLE WILSON | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| PINTEREST, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Joel Mosquera ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Pinterest, Inc. ("Pinterest" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Benjamin Silbermann, Todd Morgenfeld, Jeffrey Jordan, Leslie J. Kilgore, Jeremy S. Levine, Gokul Rajaram, Fredric G. Reynolds, Evan Sharp, and Michelle Wilson (collectively, the "Individual Defendants," and together with Pinterest, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Pinterest, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for

1

Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Pinterest , legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Pinterest's directors and officers from February 2018 through the present (the "Relevant Period") related to, *inter alia*, (i) concealing material market trends from investors regarding Pinterest's domestic user base and separately, (ii) allowing, engaging in, and concealing egregious sex and race discrimination that tarnished the Company's reputation, harmed its employees and its overall business.

2.      Pinterest is a virtual social media platform utilized by millions of people across the globe to discover content, share images, inspire, and be inspired by others. The visual platform includes products, tutorials, and advertisements/marketing from businesses. As Pinterest maintains, "[a]dvertisers are in the business of inspiration." The Company obtains its financial profit primarily through online advertising. The financial wellbeing and success of Pinterest is intimately tied to its ability to "attract, retain and engage" its user base. This means that Pinterest's financial growth prospects are dependent on the growth of its monthly active users—and the correlated revenues those users provide to the Company. The Company monetizes off targeted

advertisements to its users, depending on their search history and perceived interests. A substantial majority (two-thirds of Pinterest's 335 million) of Pinterest's monthly active users are women between the ages of 18-64, a fact that the Company is well aware of.

3.      Beginning in the middle of 2019, the Company's addressable domestic market started to approach its maximum capacity. As a result, Pinterest would not be able to significantly expand and grow its active monthly user rates in the United States. Despite this alarming trend, which would foreseeably impact the Company's financial performance, between May 16, 2019 and October 31, 2019, the Individual Defendants concealed this material information from investors, opting instead to falsely assure them on multiple occasions that Pinterest still had considerable room to grow its active user base in the United States and that the Company was expanding this domestic user base.

4.      On October 31, 2019, the Company disclosed disheartening preliminary financial results for the third fiscal quarter ended September 30, 2019 in a letter to shareholders and a press release. The press release and letter to shareholders revealed that Pinterest had missed revenue estimates, reporting net revenue of $279.7 million. Projected revenues were set at $282 million. The missed estimates reflected slowed growth in the Company's domestic market. The Company further suggested continued stalled growth in the coming quarters, barely increasing its full year guidance to be between $1,100 million and $1,115 million, compared to its previous forecast of $1,095 million and $1,115 million.

5.      On this news, the price of the Company's stock fell approximately 17%, or $4.28, tumbling from $25.14 per share at the close of trading on October 31, 2019 to $20.86 per share at the close of trading on November 1, 2019.

6.      During a follow up earnings call held on November 1, 2019, the Individual Defendants downplayed the severity of the news by emphasizing the overall growth percentage in Pinterest's user rate. Analysts responded negatively to the news and lack of growth or adequate explanation, lowering target prices for the Company significantly.

7.      Between May 16, 2019 and November 1, 2019, certain of the Individual Defendants breached their fiduciary duties by personally making, allowing and/or causing the Company to make a series of materially false and misleading statements in SEC filings, press releases, conference calls, and letters to shareholders regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Pinterest's domestic market in the United States was nearly saturated; (2) the Company's potential to capitalize on the average revenue for each domestic-based user was thereby substantially diminished; (3) consequently, Pinterest faced a heightened risk for losing revenues from advertising; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading.

8.      In light of the Individual Defendants' misconduct related to concealing material negative market trends, which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO"), to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who

benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

9.      As named defendants in the Securities Class Action, Defendants Ben Silbermann ("Silbermann") and Todd Morgenfeld ("Morgenfeld") are liable to Pinterest for contribution under Sections 10(b) and 21D of the Exchange Act if and when the Company is found liable in the Securities Class Action.

10.     Pinterest's reputation is also a significant factor in its ability to grow and succeed. As noted above, Pinterest has historically served a consumer base that is mostly comprised of women. The Company continues to rely on its majority-female user base today. Compared to other tech companies, Pinterest has stood out as one that championed diversity, inclusion, and equality and celebrated the differences individuals brought to the table. Unbeknownst to investors, however, the external face of Pinterest was a mere mask under which the Individual Defendants successfully concealed a toxic culture of sexism and racism. In stark contrast to the Company's outward marketing efforts, which have been tailored for women, internally, the Company's leadership team is dominated by men. Defendant Silbermann surrounds himself with a male clique that collectively control the tone at the top of the Company. That tone heavily favors employees that are male and disfavors employees that are female—particularly those who are Black and female.

11.     Only half a century ago, almost every single board of directors in America was solely comprised of White males. Since, most corporations have made gradual but steady progress to inculcate more diverse representation on their boards and within their executive management teams. Pinterest has superficially been at the forefront of those efforts in the tech industry.

12.     In a recent post, published by *Calvert Research and Management* following civil unrest that coincided the killing of George Floyd, among others, John Streur stated the following, in relevant part:

> We are a country suffering from racial inequality. And we want the inequality and suffering to end.
>
> Enough people agree with these points that this issue has become a matter that will impact every corporation doing business in this country. Companies that are capable of understanding their roles in taking effective action to end inequality will benefit operationally and reputationally; those that refuse to acknowledge their exposure to this massive problem or that are incapable of swift and effective action will struggle to maintain their competitive positions as employers and with consumers.

13.     As a tech Company, Pinterest's responsibility to engage and address diversity and the fair and equal treatment of employees in company leadership and throughout Pinterest is especially important. The tech industry has received increased criticism for "the number of women and racial minorities in its workforce, as those totals remain significantly lower than in the overall U.S. workforce."[1] Tech companies have taken corrective measures over the past few years in response to these criticisms. In 2018, Chief Diversity Officer at Dell Technologies, Brian Reaves, stated in an interview: "I view this topic and what we're doing as important to the future business success of the company as anything we'll do technologically . . . . It's not something that's nice to do. It's really something one must do."

14.     Notwithstanding this societal imperative, while other companies have been dedicated to achieving a significant increase in diversity within their highest ranks, the Individual Defendants have caused Pinterest to violate federal and state laws regarding diversity and

---

[1] https://www.statesman.com/news/20180827/tech-firms-said-they-wanted-to-improve-diversity-have-they-. Last visited December 14, 2020.

discrimination by outwardly touting its diverse staff, while internally discriminating against them based on their sex and race. In this way, Pinterest has been able to fool the investing public that it was not among the list of companies that perpetuated the White-male dominated tech environment. Rather, it was progressive and actively working to fight injustice and ensure people of all races, cultures, genders, and ethnicities were valued based on their merit. Simultaneously, until very recently, the Individual Defendants repeatedly refused to nominate, appoint, and/or hire Black individuals or other underrepresented minorities to the Board (the "Board"). While Pinterest heavily touted its purportedly diverse executive team and employees, the Individual Defendants failed to treat those employees with equal respect, particularly when it came to determining their compensation arrangements. Instead, as early as February 2018, the Individual Defendants created and condoned a hostile employment atmosphere replete with discrimination based on sex and race, and retaliation against those that voiced their complaints. The Individual Defendants further allowed the Company to persistently operate with deficient internal controls and failed to select an independent auditor that could identify the deficient internal controls (collectively, the "Discriminatory Misconduct").

15.     According to the Company's report with the Equal Employment Opportunity Commission ("EEOC") for 2018, less than 4% of the Company's employees were Black (a mere 64 out of 1742 employees). Within the Company's leadership, that percentage dropped to only 1%.

16.     In January 2020, Pinterest issued a diversity report, boasting that it had "exceeded all three of our external hiring goals with respect to diversity:" The report highlighted, in relevant part:

- We wanted to increase hiring rates for full-time women engineers to 25% and surpassed it with a new high of 27%.

- We wanted to increase hiring rates to 8% underrepresented minority engineers and exceeded it at 9%.
- We wanted to increase hiring rates for underrepresented minority employees across the company (business and product) to 12% and exceeded it at 14%.

17.     Yet, it was not until the Company's public image was in shambles that it finally hired its first *ever* Black female director to serve on the Board.  The Individual Defendants have attempted to save face by, among other things, incorporating a section in Pinterest's recent proxy statement titled "Board Diversity," in which the Company purports to seek diverse candidates to serve on its Board. However, contrary to the foregoing and in violation of the Company's stated commitment to prohibiting "unlawful discrimination based on race, color, ethnicity, national origin, religion, sex [], sexual orientation, gender, gender identity, gender expression, age marital statis," etc., and certain federal and state laws, the Individual Defendants have caused the Company to engage in the Discriminatory Misconduct and make illusory efforts to promote diversity on its Board and among its senior executives. In truth, as Pinterest's former Chief Operating Officer ("COO"), Francoise Brougher ("Brougher") asserted after she was illegally terminated for voicing her concerns of pay discrimination, "Pinterest's female executives, even at the highest levels, are marginalized, excluded, and silenced."

18.     After the Company posted a seemingly heartfelt message in solidarity for the Black Lives Matter movement following the brutal killing of George Floyd, Pinterest's former employees could take no more and began publicly exposing the hypocrisy plaguing the Company.

19.     In June 2020, two former female Black employees, Ifeoma Ozoma ("Ozoma") and Aerica Shimizu Banks ("Banks"), former policy officials at the Company publicly disclosed the racial discrimination they faced while working for the Company before departing in late May 2020. Critically, these women were spearheads for the Company's notorious policy initiatives, including banning certain anti-vaccine information on the platform and ending the promotion of slave

plantations for wedding venues. They also helped Pinterest secure key partnerships with various organizations and served as a public face for the Company's purported diversity efforts on many occasions. These initiatives set Pinterest out from its competitors, who soon came under fire for failing to take meaningful action against misinformation and such promotion. Despite the value these employees brought to the Company, which the Company readily benefitted from, Ozoma and Banks were placed at lower stations and pay grades as their White-male counterpart.

20.     Rather than taking Ozoma and Banks' complaints for fair treatment and equal pay at the Company seriously, the Individual Defendants subjected them to retaliation in the form of improper investigations. Even after Ozoma's safety was put at risk, the Individual Defendants failed to consider her claims and concerns and refused to take security measures to protect her from being "doxxed" or cyberattacked by scores of individuals who gained access to her personal information after a colleague leaked it over the internet. When it was clear that the Individual Defendants would only retaliate against Ozoma and Banks for bringing forth their concerns, they both departed from Pinterest.

21.     Thereafter, Ozoma and Banks posted their stories to Twitter on June 15, 2020, leading to a flurry of negative press from *Bloomberg*, *The New York Times*, *The Washington Post*, and others. Ozoma and Banks asserted that they had be subjected to "racism, gaslighting and disrespect" and that their time at the Company was "a period of glaringly unfair pay, intense discrimination. And terrifying retaliation." One organization, Color of Change, noted that "Like so many tech companies that are posting messages of solidarity with Black Lives Matter, Pinterest's actions undermine the company's own words."

22.     After initially attempting to deny the claims, Defendant Silbermann eventually admitted internally that he had failed his employees, that "I need to do better. My leaders need to do better. And Pinterest needs to be better."

23.     Not long after this admission, however, Pinterest's former COO, Brougher, filed a lawsuit against the Company in August 2020, alleging gender discrimination and retaliation. Brougher served as Pinterest's COO prior to its initial public offering ("IPO") and alleged in her lawsuit that she was underpaid compared to male executives with similar stations and experience. She further alleged that, because she was a female, she was deliberately prevented from performing her primary duties as COO and was excluded from significant meetings (including Board meetings) before and after the Company completed its IPO. Her complaint stated that her exclusion at the Company was "very insidious and real," and stated that "[w]hen men speak out, they get rewarded. When women speak out, they get fired." Brougher's allegations reinvigorated the scathing press coverage of the Company. Brougher had internally made her concerns known as early as March 2019. When Defendant Silbermann illegally fired her, he also boldly urged her to lie to her co-workers about the circumstances behind her departure: to state that it was her choice to leave.

24.     Despite her high-ranking status as COO, Brougher was given prejudiced performance reviews that overlooked her relevant accomplishments solely based on her gender and was effectively ostracized by her male colleagues—including Defendant Morgenfeld on numerous occasions, from her job.

25.     A few days after Brougher's complaint was filed, Pinterest's employees staged a virtual "walk-out" to protest the secrecy in the Company's compensation and demand more diversity within Pinterest's leadership. The employees created a website titled,

"changeatpinterest.com" and made clear that Ozoma, Banks, and Brougher's experiences were not one offs, but rather a depiction of the toxic culture at Pinterest. *Business Insider* reported that after Ozoma, Banks, and Brougher spoke out, *at least* eleven additional former employees came forth with their stories of discrimination, including several Black employees who had been pushed out of the Company inexplicably.

26.    Public outcry against Pinterest has only increased since, resulting in a massive boycott by users—which the Company depends on for its financial success. Approximately 25,000 people signed a petition demanding that Pinterest pay its Black employees what they were owed. The tarnish on the Company's name has harmed its business in a number of ways.

27.    In the face of numerous allegations—made public—depicting Pinterest's toxic work culture and environment, Defendant Silbermann finally acknowledged that "[w]hat I've learned over the past few weeks is that parts of our culture are broken. Truthfully, I didn't understand just how much work we have to do. That's not an excuse, that's a failure in leadership."

28.    In further breach of their fiduciary duties, the Individual Defendants permitted the Discriminatory Misconduct. Several of the Individual Defendants, as members of the Board, wholly failed to monitor reports of misconduct relating to gender and/or race discrimination, failed to take action against widespread sexism and racism within the Company, continuously failed to establish or maintain adequate controls that would have prevented or corrected the misconduct, and continued to appoint Ernst & Young LLP ("Ernst & Young") as independent auditor despite Ernst & Young failing to properly audit and assess the Company's inadequate internal controls. Moreover, certain of them approved discriminatory compensation arrangements, like Brougher's, as further detailed below. The Individual Defendants failed to ensure complaints were taken seriously and were investigated by disinterested individuals at the Company. The Company's co-

founder and director, Defendant Evan Sharp ("Sharp") and others, had insight into the gender and race discrimination that prevailed at the Company. Yet, they failed to investigate or take any meaningful action in response. Despite knowing about Brougher's pay complaints before and after the IPO, the Board failed to investigate the circumstances surrounding her questionable departure. Through their breaches, the Individual Defendants engaged in and/or permitted the Company and certain of the Individual Defendants to engage in the Discriminatory Misconduct, subjecting the Company to costly lawsuits, including from Brougher, Ozoma and Banks, the loss of talented employees and severe damage to the Company's reputation. In fact, as disclosed by the Company in a current report filed on Form 8-K with the SEC on December 14, 2020, the Company has agreed to pay **$22.5 million** to settle Brougher's lawsuit. According to *The Washington Post* "[i]t is the largest publicly announced individual settlement for gender discrimination in U.S. history, according to Brougher's lawyer, David Lowe."

29.     During the Relevant Period, the Individual Defendants also breached their fiduciary duties by, *inter alia*, falsely assuring the investing public in SEC filings, on the Company's website, and in corporate governance documents, that Pinterest is committed to workforce diversity, equality, and inclusion while acting in opposition to those statements.

30.     The Individual Defendants have deceived investors by claiming to abide by certain antidiscrimination policies. By engaging in the Discriminatory Misconduct, the Individual Defendants have breached their duty of candor and have also violated the federal securities laws.

31.     Not only is the Discriminatory Misconduct immoral and illegal, but it is also against the best interests of the Company, since companies with the most ethnically or culturally diverse boards worldwide are 43% more likely to experience higher profits, according to a 2018 McKinsey

& Company report.[2] Pinterest, itself, has recognized the importance of diversity at companies on multiple occasions.

32.     The Individual Defendants also caused the Company to violate Section 14(a) of the Exchange Act, as the 2020 Proxy Statement (defined below) was false and misleading for failing to disclose, *inter alia*, that: (1) the Company had engaged in the Discriminatory Misconduct; (2) that Brougher had been illegally terminated for voicing concerns of discrimination; (3) the Company does not have term limits due to a desire to keep Black and other underrepresented individuals off of the Board; (4) the Company's Nominating and Corporate Governance Committee did not actually consider diversity when nominating Board candidates; (5) the independent auditor the Company repeatedly reselected to evaluate its internal controls was neither independent nor effective at ensuring the adequacy of the Company's internal controls; and (6) the Company failed to maintain adequate internal controls. The 2020 Proxy Statement also misrepresented the Company's executive compensation policies and practices.

33.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendant Silbermann's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

---

[2] https://www.mckinsey.com/~/media/mckinsey/business%20functions/organization/our%20insights/delivering%20through%20diversity/delivering-through-diversity_full-report.ashx, p.14. Last visited December 4, 2020.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

35.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action.

36.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

37.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

38.     Venue is proper in this District because Pinterest is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

39.     Plaintiff is a current shareholder of Pinterest. Plaintiff has continuously held Pinterest common stock at all relevant times.

### Nominal Defendant Pinterest

40.     Pinterest is a Delaware corporation with its principal executive offices at 505 Brannan Street, San Francisco, California 94107. Pinterest 's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "PINS."

### Defendant Silbermann

41.     Defendant Silbermann co-founded Pinterest and has served as Pinterest's CEO and President since 2012 and as a Company director since 2008. He is also Chairman of the Board. According to the Company's Schedule 14A filed with the SEC on April 9, 2020 (the "2020 Proxy Statement"), as of March 31, 2020, Defendant Silbermann beneficially owned 50,246,508 of the Company's Class B common stock, which represented 27.47% of Class B common stock and 24.77% of the total voting power as of that date.[3] Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $15.44, Defendant Silbermann owned approximately $775 million worth of Pinterest stock.

42.     For the fiscal year ended December 31, 2019, Defendant Silbermann received $46,222,113 in compensation from the Company. This included $197,100 in salary, $45,745,013 in stock awards, and $280,000 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Silbermann received $197,000 in compensation, all consisting of salary.

43.     The Company's website[4] stated the following about Defendant Silbermann:

Benjamin Silbermann is chairman of the board of directors, and the Co-Founder, President and Chief Executive Officer of Pinterest. Prior to co-founding Pinterest, Mr. Silbermann worked at Google from 2006 to 2008. He holds a Bachelor of Arts from Yale University.

**Defendant Morgenfeld**

44.     Defendant Morgenfeld has served as Pinterest 's CFO since 2016. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Morgenfeld beneficially owned 726,345 shares of the Company's Class A common stock and 81,518 shares of Class B common stock.

---

[3] The Company's Class B common stock is convertible at any time into Class A common stock on a share-by-share basis. Each share of Class A common stock is entitled to one vote per share, while each share of Class B common stock is entitled to 20 votes per share.

[4]     https://investor.pinterestinc.com/governance/board-of-directors/default.aspx.   Last   visited December 10, 2020.

Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $15.44, Defendant Morgenfeld owned over $12 million worth of Pinterest stock.

45.    For the fiscal year ended December 31, 2019, Defendant Morgenfeld received $360,500 in compensation from the Company, all consisting of salary. For the fiscal year ended December 31, 2018, Defendant Morgenfeld received $22,389,196 in compensation from the Company. This included $360,500 in salary and $22,028,696 in stock awards.

46.    The 2020 Proxy Statement stated the following about Defendant Morgenfeld:

**Todd Morgenfeld** has served as our Chief Financial Officer since November 2016. Prior to joining Pinterest, he served as Vice President of Finance at Twitter, a social networking company, from 2015 to 2016 and Treasurer and Senior Vice President of Corporate Development and Corporate Financial Analytics at Hewlett-Packard Company, a multinational information technology company, from 2013 to 2015. He served as an investment partner at Silver Lake, a private equity firm from 2004 to 2013. He currently serves on the board of Urban Outfitters, Inc. Mr. Morgenfeld holds a Master of Business Administration from Stanford Graduate School of Business and a Bachelor of Science from the United States Military Academy, where he graduated first in his class.

### **Defendant Jordan**

47.    Defendant Jeffrey Jordan ("Jordan") has served as a Company director since 2011. He also serves as a member of the Compensation Committee. Defendant Jordan also serves as a managing partner at Andreessen Horowitz, a venture capitalist firm, and a significant investor for the Company. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Jordan beneficially owned 131,239 of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $15.44, Defendant Jordan owned over $2 million worth of Pinterest stock.

48.    For the fiscal year ended December 31, 2019, Defendant Jordan received $291,245 in compensation from the Company. This included $41,250 in fees earned or cash paid and $249,995 in stock awards.

16

49.     The 2020 Proxy Statement stated the following about Defendant Jordan:

Jeffrey Jordan has served at Andreessen Horowitz, a venture capital firm, since 2011 and most recently as a Managing Partner. Previously, Mr. Jordan served as President and Chief Executive Officer of OpenTable, Inc., an online restaurant reservation service company, from 2007 to 2011. He served as President of PayPal, Inc., an internet-based payment system company then owned by internet retail company eBay Inc., from 2004 to 2006, and as Senior Vice President and General Manager of eBay North America from 1999 to 2004. He also served as Chief Financial Officer of Hollywood Entertainment, a video rental company and as President of its subsidiary, Reel.com. Previously, Mr. Jordan served in various capacities at The Walt Disney Company, an entertainment company, for eight years, most recently as Senior Vice President and Chief Financial Officer of The Disney Store Worldwide. Prior to that, he worked for the Boston Consulting Group, Inc., a management consulting firm. Mr. Jordan currently serves on the board of several private companies and previously served on the board of OpenTable, Inc from 2007 to 2013.

### Defendant Kilgore

50.     Defendant Leslie J. Kilgore ("Kilgore") served as a Company director since 2019. She also serves as a member of the Audit Committee and Compensation Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Kilgore beneficially owned 9,671 shares of the Company's Class A common stock and 6,837 shares of Class B common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $15.44, Defendant Kilgore owned approximately $254,883 worth of Pinterest stock.

51.     For the fiscal year ended December 31, 2019, Defendant Kilgore received $706,528 in compensation from the Company. This included $54,375 in fees earned or cash paid and $652,153 in stock awards.

52.     The 2020 Proxy Statement stated the following about Defendant Kilgore:

Leslie Kilgore served as Chief Marketing Officer of Netflix, Inc., an online entertainment service, from 2000 to 2012. From 1999 to 2000, she served as Director of Marketing of Amazon.com, Inc., an internet retailer. Ms. Kilgore held various positions, including Brand Manager, at The Proctor & Gamble Company, a manufacturer and marketer of consumer products, from 1992 to 1999. Ms. Kilgore served on the board of LinkedIn Corporation from 2010 to 2016 where she served Leslie Kilgore served as Chief Marketing Officer of Netflix, Inc., an

online entertainment service, from 2000 to 2012. From 1999 to 2000, she served as Director of Marketing of Amazon.com, Inc., an internet retailer. Ms. Kilgore held various positions, including Brand Manager, at The Proctor & Gamble Company, a manufacturer and marketer of consumer products, from 1992 to 1999. Ms. Kilgore served on the board of LinkedIn Corporation from 2010 to 2016 where she served as the chair of their compensation committee.as the chair of their compensation committee.

**Defendant Levine**

53.     Defendant Jeremy S. Levine ("Levine") has served as a Company director since 2011. He also serves as Chair of the Governance Committee. Defendant Levine also serves as a partner at Bessemer Venture Partners ("Bessemer"), a venture capitalist firm, and a significant investor for the Company. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Levine beneficially owned 654,342 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $15.44, Defendant Levine owned approximately $10 million worth of Pinterest stock.

54.     For the fiscal year ended December 31, 2019, Defendant Levine received $294,995 in compensation from the Company. This included $45,000 in fees earned or cash paid, and $249,995 in stock awards.

55.     The 2020 Proxy Statement stated the following about Defendant Levine:

Jeremy Levine has served as a partner at Bessemer Venture Partners, a venture capital firm, since 2001, where his investment experience includes entrepreneurial startups and high growth companies including consumer internet, consumer software and business software and services. Prior to joining Bessemer, Mr. Levine was Vice President of Operations at Dash.com Inc., an internet software publisher, from 1999 to 2001. Prior to Dash, Mr. Levine was an Associate at AEA Investors, a management buyout firm, where he specialized in consumer products and light industries, from 1997 to 1999. Previously, Mr. Levine was with McKinsey & Company, a management consultant firm, as a management consultant from 1995 to 1997. Mr. Levine previously served on the board of directors of MINDBODY Inc. from 2010 to 2017 and Yelp from 2005 to 2019.

**Defendant Rajaram**

56.     Defendant Gokul Rajaram (Rajaram") served as a Company director since 2020. He also serves as a member of the Governance Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Rajaram beneficially owned 1,531 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $15.44, Defendant Rajaram owned approximately $23,638 worth of Pinterest stock.

57.     The 2020 Proxy Statement stated the following about Defendant Rajaram:

Gokul Rajaram has served as the Caviar Lead at DoorDash, a food ordering service, since November 2019. Previously, from 2013 to 2019, Mr. Rajaram led several product development teams at Square, Inc. a financial technology company, most recently as the Caviar Lead. Prior to Square, Inc., Mr. Rajaram served as Product Director of Ads at Facebook, Inc., a social media company, from 2010 to 2013. Previously, Mr. Rajaram was Product Management Director for Google AdSense, an online advertising company. He previously served on the board of RetailmeNot, Inc. and currently serves on the board of Course Hero, Inc., which is a private company.

**Defendant Reynolds**

58.     Defendant Frederic G. Reynolds ("Reynolds") has served as a Company director since 2017. He also serves as Chair of the Audit Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Reynolds beneficially owned 49,671 shares of the Company's Class A common stock and 56,250 shares of Class B common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $15.44, Defendant Reynolds owned approximately $1.6 million worth of Pinterest stock.

59.     For the fiscal year ended December 31, 2019, Defendant Reynolds received $306,245 in compensation from the Company. This included $56,250 in fees earned or cash paid and $249,995 in stock awards.

60.     The 2020 Proxy Statement stated the following about Defendant Reynolds:

Fredric Reynolds served as Executive Vice President and Chief Financial Officer

of CBS Corporation, a mass media company, from 2006 to 2009. From 2001 to 2005, he served as President and Chief Executive Officer of Viacom Television Stations Group and as Executive Vice President and Chief Financial Officer of Viacom Inc., a mass media company, from 2000 to 2001. He also served as Executive Vice President and Chief Financial Officer of Westinghouse Electric Corporation, a predecessor of CBS Corporation. Prior to that, Mr. Reynolds held several positions at PepsiCo, a food and beverage corporation, for twelve years, including Chief Financial Officer or Financial Officer at Pizza Hut, Pepsi Cola International, Kentucky Fried Chicken Worldwide and Frito Lay. Mr. Reynolds served on the board of AOL, Inc. from 2009 to 2015 and on the board of Hess Corporation from 2013 to 2019.

**Defendant Sharp**

61.     Defendant Evan Sharp ("Sharp") co-founded Pinterest and has served as a Company director since 2019. He also serves as the Company's Chief Design & Creative Officer. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Sharp beneficially owned 9,774,358 shares of the Company's Class B common stock, which represented 5.34% of Class B shares and 4.82% of the total voting power as of that date. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $15.44, Defendant Sharp owned nearly $160 million worth of Pinterest stock.

62.     For the fiscal year ended December 31, 2019, Defendant Sharp received $46,075,013 in compensation from the Company. This included $330,000 in salary, and $45,745,013 in stock awards.

63.     The 2020 Proxy Statement stated the following about Defendant Sharp:

Evan Sharp is a Co-Founder of Pinterest and serves as our Chief Design & Creative Officer. He has overseen the creative, product and design teams at Pinterest since 2011. He was previously a product designer at Facebook, a social media company, from 2010 to 2011.

**Defendant Wilson**

64.     Defendant Michelle Wilson ("Wilson") has served as a Company director since 2016. She also serves as a member of the Compensation Committee and Audit Committee.

According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Wilson beneficially owned 9,671 shares of the Company's Class A common stock and 100,000 Class B common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2020 was $15.44, Defendant Wilson owned nearly $1.7 million worth of Pinterest stock.

65.     For the fiscal year ended December 31, 2019, Defendant Wilson received $326,870 in compensation from the Company. This included $76,875 in fees earned or cash paid and $249,995 in stock awards.

66.     The 2020 Proxy Statement stated the following about Defendant Wilson:

Michelle Wilson worked in various capacities, including Senior Vice President and General Counsel, at Amazon.com, Inc. an online retail company, for 13 years until 2012. Previously, Ms. Wilson was a partner at Perkins Coie LLP, a law firm, and served as a member of the firm's executive committee. Ms. Wilson has also served on the board of Stripe, Inc. since 2018.

## <u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

67.     By reason of their positions as officers, directors, and/or fiduciaries of Pinterest and because of their ability to control the business and corporate affairs of Pinterest, the Individual Defendants owed Pinterest and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Pinterest in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Pinterest and its shareholders so as to benefit all shareholders equally.

68.     Each director and officer of the Company owes to Pinterest and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

69.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Pinterest, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

70.     To discharge their duties, the officers and directors of Pinterest were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

71.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Pinterest, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Pinterest 's Board at all relevant times.

72.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination

of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

73.     To discharge their duties, the officers and directors of Pinterest were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Pinterest were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Pinterest's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Pinterest conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Pinterest and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Pinterest 's operations would comply with all applicable laws and Pinterest 's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

74.    Each of the Individual Defendants further owed to Pinterest and the shareholders the duty of loyalty requiring that each favor Pinterest 's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

75.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Pinterest and were at all times acting within the course and scope of such agency.

76.    Because of their advisory, executive, managerial, and directorial positions with Pinterest, each of the Individual Defendants had access to adverse, non-public information about the Company.

77.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Pinterest.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

78.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

79.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

80.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Pinterest was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

81.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

82.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Pinterest and was at all times acting within the course and scope of such agency.

## THE INDIVIDUAL DEFENDANTS VIOLATE AND MISUSE PINTEREST'S CODE OF CONDUCT AND GOVERNANCE

83.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct") provides that it "applies to Pinterest, Inc. and its subsidiaries and controlled affiliates ("Pinterest") and to Pinterest employees, officers, and board members (each "you") located anywhere in the world." The Code of Business Conduct's first page emphasizes Pinterest's motto to "Act with integrity," stating in relevant part: "'Act with integrity' has guided our business choices since Pinterest was founded. We want to do what's right by our Pinners, right by our partners, right by our stockholders, and right by one another."

84.     The Code of Conduct asserts that "[c]omplying with the law is important, but we go further: we also act ethically and responsibly, use good judgment, protect the company, and treat our colleagues and members of the Pinterest community with respect. We speak up if we see something wrong, and we ask for help when we need it."

85.     In a section titled, "Compliance with applicable law," the Code of Conduct states

that, "[a]t Pinterest, we respect all applicable law, including local laws and regulations that apply

to our business. Comply with applicable law and follow our Pinterest policies and procedures."

86.     In a section titled, "Confidentiality," the Code of Conduct states the following:

> Pinner trends, partner metrics, and Pinterest business strategies, financial
> performance data, or employee information could all be confidential information,
> for example. Keep it confidential, even after you leave Pinterest. Internally,
> exercise discretion and only share confidential information with those who need to
> know it. Use confidential information only to the extent necessary to do your job,
> and for Pinterest's sole benefit. Handle it in accordance with our data and
> information security policies, such as our Acceptable Use Policy, and any
> confidentiality agreement that applies to that information or to you.

87.     In a section titled, "Accurate books and records," the Code of Conduct states the

following:

> Pinterest is legally obligated to keep records that are detailed, accurate, and fairly
> reflect our business. We also must make full, fair, accurate, timely and
> understandable disclosures to the public and to our stockholders about our
> operations, strategies, risks and performance. We maintain corporate controls that
> help us satisfy these requirements and provide reasonable assurances about the
> reliability of our financial reporting.
>
> * * *
>
> Submit accurate and truthful certifications about matters within your area of
> responsibility when requested; and promptly report any suspected fraud or policy
> violations through our established reporting channels.

88.     In a section titled, "Be a good coworker," the Code of Conduct states the following,

in relevant part:

> Individual success depends on the success of our collective team. Each of us is
> responsible for creating a safe, respectful and inclusive community at work.
>
> **Diversity and inclusion**
> Pinterest strives to build products and services that inspire everyone. Having a
> diverse and inclusive workforce is critical to achieving this aspiration. By bringing
> together different talents and perspectives into a room, we will accelerate our
> progress in product development, growth, monetization and other key strategies.

Pinterest values your individual backgrounds, experiences, differences, and capabilities, and expects you to do the same with your colleagues.

**Equal employment opportunity**
We want to have the best qualified people in every job. Pinterest is an equal opportunity employer and makes employment decisions on the basis of merit. We prohibit unlawful discrimination based on race, color, ethnicity, national origin, religion, sex (including pregnancy, childbirth, or related medical conditions), sexual orientation, gender, gender identity, gender expression, age, marital status, status as a protected veteran, physical or mental disability, medical condition, genetic information or characteristics (or those of a family member), or any other consideration made unlawful by applicable federal, state, or local laws. Discrimination based on a perception that anyone has any of those characteristics, or is associated with a person who has or is perceived as having any of those characteristics, is also prohibited. Pinterest expects you to adhere to Pinterest's policies and the law in this regard.

**Harassment and discrimination**
Pinterest is committed to providing a work environment that is free of discrimination, harassment, mistreatment and retaliation. Comply with our Harassment and Discrimination Policy, and share any concerns through one of the channels noted below.

**Respectful communication**
We work closely with our Pinterest teammates to inspire Pinners and ourselves. Care with candor. Communicate openly, professionally and inclusively. Assume best intentions. Be sensitive to how your words and actions impact those around you, and respect our cultural and geographic differences. Remember that we all learn from each other.

**Workplace safety**
Pinterest is committed to providing a clean, safe and violence free workplace. We strive to protect the natural world and to comply with all applicable environmental, health and safety laws.

We don't tolerate threats, hostility, disrespectful conduct, or aggressive acts, and weapons are not permitted on Pinterest premises. Alert Security immediately to report any concerns about unsafe conditions, accidents or injuries.

89.     The Code of Conduct further encourages employees to "speak up." In a section titled, "Reporting and enforcement," and "Non-retaliation," the Code of Conduct states the following in relevant part:

Pinterest wants to support a work culture where everyone feels comfortable doing their best work. It is very important that you report any suspected violations of this Code, as well as any other suspected unethical behavior or illegal conduct. But if you're uncomfortable for any reason, even if you don't think it rises to the level of a policy violation, we encourage you to reach out. Pinterest takes reports very seriously and will promptly and thoroughly investigate all credible concerns raised. When asked, you're expected to help us with our investigations as needed.

\* \* \*

You can come forward with any questions or concerns without fear of retaliation. Pinterest will not tolerate retaliation against anyone for seeking advice, making a good-faith report of suspected misconduct, or for participating in the investigation of suspected misconduct.

90.     With respect to "Compliance with this Code," the Code of Conduct acknowledges:

Violations can be serious. Failing to adhere to this Code could have serious consequences for you and for Pinterest. In addition to hurting our reputation, in some cases non-compliance may violate the law and could result in litigation, civil and/or criminal penalties, fines, and even imprisonment. In addition, your failure to comply with this Code can result in disciplinary action, up to and including termination.

91.     The Individual Defendants could not waive the duties outlined in the Code of Conduct, including their responsibilities to oversee Pinterest's management, policies and practices without the Board's acquiescence: "any waiver for a Pinterest officer or board member must be approved by the full Pinterest, Inc. Board of Directors and promptly disclosed in accordance with legal requirements."

**The Nominating and Corporate Governance Committee Charter**

92.     Pinterest's Nominating and Corporate Governance Committee Charter provides that the purpose of the Nominating and Corporate Governance Committee is to:

- Assist the Board of Directors (the "Board") by identifying and evaluating individuals qualified to become Board members, consistent with criteria approved by the Board;
- Recommend for the Board's approval the slate of nominees to be proposed by the Board to stockholders for election to the Board or nominees for election to fill interim vacancies on the Board;

- Develop, update as necessary and recommend to the Board corporate governance guidelines applicable to Pinterest and oversee related corporate governance matters;
- Lead the review of the performance of the Board and each of its standing committees;
- In conjunction with the Compensation Committee, oversee the evaluation of management; and
- Recommend to the Board the directors who will serve on each committee of the Board.

93.     The Nominating and Corporate Governance Committee Charter further provides

that the committee's responsibilities include:

*Director Nominees*. The Committee will develop, update as necessary and recommend to the Board policies for considering director nominees for election to the Board, which policies will reflect requirements of applicable law or listing rules, factors related to the composition of the Board (including size and structure), principles of diversity, and factors including regarding integrity, judgment, experience, and ability to devote sufficient time to attendance at and preparation for Board meetings.

\* \* \*

*Board Evaluations*. The Committee will oversee the performance and annual self-evaluation process for the Board and each standing Committee, including conducting surveys of director observations, suggestions and preferences regarding how effectively the Board operates. The Committee will evaluate the participation of members of the Board in continuing education activities in accordance with any applicable listing rules. The Committee Chair will report the Committee's conclusions to the Board and may make recommendations to the Chairman of the Board regarding changes that the Committee deems appropriate. The Committee will evaluate whether a director who notifies the Board of a change in job responsibilities continues to satisfy the Board's membership criteria and recommend action to be taken, if any, with respect to the director.

\* \* \*

*Corporate Governance Guidelines*. The Committee will establish and recommend to the Board corporate governance guidelines ("Corporate Governance Guidelines") addressing, among other things, the size, composition and responsibilities of the Board and its Committees, including its oversight of management, risks and exposures associated with director and management succession planning, corporate governance, and overall board effectiveness. The Committee shall meet in executive session with key management personnel and representatives of outside advisors as required. At least annually, the Committee

will review the Corporate Governance Guidelines and make recommendations to the Board with respect to changes that the Committee deems appropriate.

*Ability to Investigate*; Retention of Advisors. The Committee has the power to investigate any matter brought to its attention, with full access to all Pinterest books, records, facilities and employees. The Committee has the authority to select, retain, oversee and terminate consultants, legal counsel or other advisors, including director search firms (each, a "Consultant"), to advise the Committee, at the expense of Pinterest, and to approve the terms of any such engagement and the fees of any such Consultants. In selecting a Consultant, the Committee will take into account factors that are required by applicable law or listing standards and such other factors that it considers appropriate.

### Corporate Governance Guidelines

94.     The Company's Corporate Guidelines outlines the roles and responsibilities of the

Board as follows:

The Board, elected by the stockholders, is the ultimate decision-making body of the Company, except with respect to matters reserved to the stockholders. ***The primary function of the Board is oversight. The Board, in exercising its business judgment, acts as an advisor and counselor to senior management and defines and enforces standards of accountability, all with a view to enabling senior management to execute their responsibilities fully and in the best interests of the Company and its stockholders.*** Consistent with that function, the primary responsibilities of the Board include:
* overseeing and reviewing the Company's strategic direction and objectives, taking into account (among other considerations) the Company's risk profile and exposures and its relationships with key stakeholders;
* selecting, evaluating and compensating the Chief Executive Officer ("CEO") and other key executives, and planning for CEO and key executive succession;
* overseeing the Company's compliance with applicable legal and regulatory requirements and the processes that are in place to safeguard the Company's assets and manage material risks;
* monitoring the Company's accounting and financial reporting practices and reviewing financial and other controls; and
* evaluating the Board's composition, performance and effectiveness in carrying out such responsibilities.

(Emphasis added.)

95.     With respect to "Term Limits; Retirement," the Corporate Governance Guidelines

states, "[t]he Board does not believe that it is advisable to establish term limits for its directors

31

because . . . term limits may deprive the Company and its stockholders of the contribution of directors who have been able to develop valuable insights into the Company and its operations over time."

96.    In a section titled, "Ethics and Code of Conduct," the Corporate Governance Guidelines states:

> The Board expects all directors to act ethically at all times and to adhere to the Company's Code of Business Conduct & Ethics and other applicable policies. Any request by a director or executive officer for a waiver under the Code of Business Conduct & Ethics must be sent to and approved by the full Board, and any approvals must be disclosed to stockholders, including the reasons for such approval, in accordance with the procedures set forth in the Code of Business Conduct & Ethics.

**<u>Additional Duties Outlined in the Compensation Committee and Audit Committee Charters</u>**

97.    The Individual Defendants, most of whom are the Company's current directors, had additional duties and responsibilities based on their respective service on the Company's Compensation or Audit Committee.

98.    As stated in the Compensation Committee Charter, the purpose of the Compensation Committee is to "oversee the compensation of Pinterest's directors and employees, including executive officers ("Employees") and related matters, including matters relating to the attraction, development and retention of Employees." The Compensation Committee's responsibilities included the following:

> *CEO Compensation.* At least annually, the Committee will determine Pinterest's goals that are relevant to the compensation of the Chief Executive Officer (the "CEO"). The Committee will evaluate the performance of the CEO in light of those goals and determine the compensation of the CEO based on such evaluation.
>
> * * *
>
> *Executive Officer Compensation.* The Committee will evaluate the performance of the executive officers and determine the compensation of the executive officers of Pinterest based on such evaluations.

*Incentive Compensation.* In determining incentive compensation for the CEO and other executive officers, the Committee will consider, among other factors it deems appropriate from time to time, Pinterest's performance during such periods as the Committee deems appropriate and the awards given in prior years. The Committee will make recommendations to the Board for the establishment and terms of incentive-compensation and equity-based plans and will administer such plans, including determining awards for directors or executive officers under any such plan. The Committee may establish policies and delegate authority in respect of equity-based compensation grants made to Employees other than executive officers, as it deems appropriate in accordance with applicable law.

\* \* \*

*Evaluation of Compensation Program.* The Committee will review periodically the operation and structure of Pinterest's compensation program, including its policies regarding perquisites, recoupment of compensation, non-executive post-service arrangements and other similar compensation-related matters. The Committee will take into account factors it deems appropriate from time to time, including Pinterest's business strategy, the competitiveness of the compensation program and the potential risks to Pinterest and its business arising from the operation and structure of its compensation programs. The Committee will monitor total equity usage for compensation.

\* \* \*

*Say-on-Pay Vote.* When performing its responsibilities and exercising its authorities under this Charter, the Committee will consider the most recent shareholder advisory vote on executive compensation required by Section 14A of the Exchange Act (the "Say-on-Pay Vote"), review and recommend to the Board the cadence of conducting Say on Pay Votes, and review and approve proposals regarding the Say-on-Pay Vote to be included in Pinterest's proxy statement.

99.     The Compensation Committee was also responsible for overseeing "short-term and long-term management succession planning and assessment and development." Like the Nominating and Corporate Governance Committee, the Compensation Committee also had the "power to investigate any matter brought to its attention, with full access to all Pinterest books, records, facilities and Employees."

100.     Pursuant to Pinterest's Audit Committee Charter, the Audit Committee's responsibilities included overseeing "Pinterest's accounting and financial reporting processes, including Pinterest's disclosure controls and procedures, system of internal controls, internal audit function and audits of Pinterest's consolidated financial statements;" overseeing "Pinterest's

33

relationship with its independent auditors, including appointing or changing Pinterest's auditors and ensuring their independence, qualification and performance;" providing "oversight regarding significant financial matters, including Pinterest's . . . financial risk exposure," and overseeing "Pinterest's compliance with applicable legal and regulatory requirements and Pinterest's enterprise risk management program."

101.    Notably, "[t]he Audit Committee's main responsibility is to oversee Pinterest's financial reporting process, including Pinterest's disclosure controls and procedures and system of internal controls."

102.    Among other duties, the Audit Committee is responsible for the following:

*Hiring and Selection of Auditors*. The Audit Committee will directly appoint, retain and compensate Pinterest's independent auditors. These independent auditors will report directly to, and be responsible to, the Audit Committee.

*Approval of Audit and Non-Audit Services*. The Audit Committee is responsible for overseeing services provided by the independent auditors, including establishing a policy to decide what services will be performed and the approval requirements for these services.

*Auditor Independence*. At least annually, the Audit Committee will review the qualifications, performance and independence of the auditors, taking into account the opinions of management and the head of the internal audit function. The Audit Committee shall review a written report from any independent auditors explaining the auditors' internal quality-control procedures and any issues raised by the most recent internal quality-control review (or any peer review or inquiry or investigation by governmental or professional authorities), and all relationships between the outside auditors and Pinterest, and any other reports as required by law or the Public Company Accounting Oversight Board regarding the independent auditor's communications with the Audit Committee concerning independence. The Audit Committee will discuss with the independent auditors any disclosed relationships or services that may impact their objectivity and independence. The Audit Committee will oversee the policies and procedures as required by applicable rules and regulations governing how Pinterest may employ or receive services from individuals who are or once were employed by the independent auditors. The Audit Committee will take, or recommend to the Board that it take, appropriate actions to oversee the independence of Pinterest's outside auditors.

*Oversight of Auditors; Audit Plan*. The Audit Committee will review and discuss with the independent auditors the overall scope and results of the annual audit and

other financial reviews, including the adequacy of staffing and rotation of audit partners as required by SOX and SEC rules and regulations. The Audit Committee will be responsible for reviewing and resolving any disagreements between Pinterest's management and the independent auditors regarding financial controls or financial reporting.

*Internal Controls; Oversight*. The Audit Committee will discuss with management and the independent auditors, and provide oversight over, the design, implementation, adequacy and effectiveness of Pinterest's internal controls and material changes in such controls. The Audit Committee will review any significant deficiencies in the design or operation of internal control over financial reporting or material weaknesses therein and any fraud involving management or other employees who have a significant role in Pinterest's internal control over financial reporting, and any required disclosures regarding Pinterest's internal controls.

*Risk Assessment.* The Audit Committee has responsibility for oversight of risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure, internal control over financial reporting, investment guidelines and credit and liquidity matters, programs and policies relating to legal and regulatory compliance and strategy, and operational infrastructure, particularly reliability, business continuity, capacity, information security, data protection and privacy. The Audit Committee shall provide regular reports to the full Board. The Audit Committee will review and assess Pinterest's processes to manage and control risk, except for risks retained by the Board or its other committees.

* * *

*Quarterly and Annual Financial Statements.* The Audit Committee will review and discuss the annual audited financial statements and the quarterly financial statements with management and the independent auditors. At any time Pinterest is subject to the requirements of the Exchange Act, the Audit Committee will review and discuss with management and the independent auditors the financial information and related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and be responsible for making a recommendation to the Board as to whether Pinterest's annual audited financial statements should be included in Pinterest's Annual Report on Form 10-K.

*Proxy Report*. The Audit Committee will oversee the preparation of any report required to be prepared by it for inclusion in any proxy statement of Pinterest under applicable rules and regulations.

*Earnings Announcements*. The Audit Committee will review and discuss with management and the independent auditors any earnings press releases, earnings 3 guidance provided to analysts and rating agencies, and other public announcements regarding Pinterest's results of operations.

103.    The Audit Committee was also empowered to investigate matters brought to its attention and had full access to Pinterest's books, records, facilities and employees in relation.

104.    Significantly, in a section titled, "Legal, Regulatory and Compliance," the Audit Committee Charter sets forth that:

> ***The Audit Committee will be responsible for overseeing legal and regulatory matters that have a material impact on Pinterest's financial statements and reviewing and approving the adequacy and effectiveness of Pinterest's compliance policies and procedures, including the Code of Conduct & Ethics***. The Audit Committee shall have access to management, the General Counsel, internal and independent auditors in connection with such review. The General Counsel has express authority to communicate at any time with the Chair of the Audit Committee about compliance matters.

105.    The Individual Defendants, as officers and directors of the Company, breached their fiduciary duties to Pinterest by, *inter alia*, utterly failing to uphold their duties under the Company's Code of Conduct, policies, and corporate governance. Instead, the Individual Defendants utilized the Company's charters to facilitate the Individual Defendants' misconduct and ensure the "boy's club" of White associates surrounding Silbermann stayed safely in place. The Individual Defendants who sat on the Board, in particular, allowed Defendants Silbermann, Morgenfeld and the Company's legal counsel to purportedly "investigate" complaints lodged against them and chose to turn the other cheek and remain complacent.

106.    By March 2019, at least, it was no secret that something was amiss with the Company's disparate treatment of women employees, including executives like Brougher. Faced with glaring red flags that the Company's public image of diversity and equality was a mere facade, the Individual Defendants were either direct perpetrators of the misconduct or chose to stay silent and take no action, thereby facilitating its continuation. In the summer of 2020, the floodgates would open, and more claims of discrimination and retaliation would emerge, further supporting

the Individual Defendants' knowledge and awareness of the Discriminatory Misconduct, long before its public exposure.

107.    In blatant violation of the Code of Conduct, the Board committee charters of the Nominating and Corporate Governance Committee, Compensation Committee, and Audit Committee, and Pinterest's Corporate Governance Guidelines, the Individual Defendants engaged in or permitted the Discriminatory Misconduct. The Discriminatory Misconduct was not only a clear breach of the Company's policies but was also illegal under state and federal laws.

108.    Employment discrimination and sexual harassment violate federal law and state laws in Delaware, among other states in which Pinterest operates. *See* Del. Code Ann. Tit. 19, § 711A (West 2019). Title VII of the Civil Rights Act of 1964 ("Title VII"), is a federal statute that was enacted to protect individuals from being discriminated against and applies to employers with 15 or more employees, like Pinterest. Under Title VII, it is illegal to discriminate on the basis of race, sex, color, religion, and national origin and to retaliate against an individual who brings a complaint or takes other action in connection with a discrimination lawsuit or investigation.

109.    The Individual Defendants conducted little, if any, oversight of the Company's engagement in the Discriminatory Misconduct, or the Individual Defendants' schemes to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including possibly Title VII and state laws prohibiting discrimination and/or retaliation, breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and aiding and abetting thereof.  Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations,

conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

110.   Pinterest is a virtual social media platform that was founded in 2010 by Defendants Silbermann, Sharp, and Paul Sciarra ("Sciarra"). The idea for the Company arose in 2008, when Defendant Silbermann and Sciarra co-founded a mobile shopping startup after attending Yale University together. They dubbed their company, "Cold Brew Labs." Their main product was the "Tote" mobile application made for the iPhone, which allowed users to browse 30 stores, save their favorite items, and receive notifications about any special sales. However, the application did not garner much success. One of the ways customers utilized the application was to save images of their favorite products and send those images to themselves. The collection feature and use of the application sparked the idea for Pinterest.

111.   By 2011, the Company was already worth $200 million, as it had significant financial backing from Bessemer and Andreessen Horowitz, venture capital firms associated with Pinterest's current directors, Defendants Levine and Jordan, respectively. Andreessen Horowitz alone invested $27 million in the Company. Due to these early investments, the new tech company grew at an impressive speed and swiftly became the third-largest social network in the United States. Pinterest was one of Defendant Jordan's first investments as a venture capitalist and was his first IPO. Defendant Levine, likewise, was intimately entwined with the Company from an early stage, and his firm led the Company's $10 million Series A investment round in 2011. The business relationships between the Company, Bessemer and Anderson Horowitz are not limited to Board membership and early investments. There has also been flexible movement between the three. In 2012, Sciarra began transitioning out of the Company and moved to Andreessen Horowitz

to serve as an entrepreneur-in-residence. After leading the Series A round with Defendant Levine, a former member of Bessemer named Sarah Tavel joined Pinterest a year later as a business developer the next year in 2012.

112.    Pinterest is utilized by millions of people via its website or application across the globe to discover content, share images, inspire, and be inspired by others. The Company describes itself as a "media-rich utility" that is distinct from other consumer internet companies that are focused on either search tools or media. Utilizers of the service are referred to as "Pinners." Pinners can navigate visual recommendations or "Pins," organize ideas, and save their pins to collections that serve as graphic inspiration for various undertakings—including personal projects, travel, wedding preparation, fitness, home décor, meal planning, and more. Pinterest heavily relies on its online advertising to generate revenues. To be successful and profitable as a business, Pinterest relies on "attract[ing], retain[ing] and engag[ing]" its user base. Indeed, Pinterest derives most of its revenues from advertising. As such, Pinterest's growth opportunities are contingent on increasing the number of monthly active users who utilize the platform and respond to advertisements marketed on Pinterest by businesses that purchase those ads. The advertisements are targeted to Pinterest users based on their search history, demographics, interests, and other data collected by Pinterest.

113.    In March 2019, the Company initiated its IPO. Pinterest's shares began publicly trading in April 2019. Although the Company's shares were publicly traded, the Individual Defendants enacted a dual stock arrangement whereby the Company's holders of Class B common stock were entitled to 20 times the voting power as Class A common stockholders. Pinterest's IPO filings noted that holders of Class B common stock would hold 92% of the total voting power at the Company and would thus "have the ability to control the outcome of matters submitted to

stockholders for approval, including the election of our directors and the approval of any change in control transaction." The largest stockholders at the time of the IPO were Bessemer and Andreesen Horowitz. Defendants Silbermann and Sharp as well as Sciarra also held significant share holdings of Class B common stock. The Company's 2020 Proxy Statement continues to recognize the significant influence and control the Individual Defendants, and Sciarra, have over the Company:

> ***The dual class structure of our common stock has the effect of concentrating voting control with those stockholders who held our capital stock prior to the completion of our initial public offering ("IPO"), including our co-founders, executive officers, employees and directors, their affiliates, and all of our other pre-IPO stockholders (including those unaffiliated with any of our co-founders, executive officers, employees or directors). This will limit or preclude your ability to influence corporate matters.***

* * *

> As a result, for the foreseeable future, holders of our Class B common stock could have significant influence over the management and affairs of our company and over the outcome of all matters submitted to our stockholders for approval, including the election of directors and significant corporate transactions, such as a merger, consolidation or sale of substantially all of our assets, even if their stock holdings were to represent in the aggregate less than 50% of the outstanding shares of our capital stock. In addition, this may prevent or discourage unsolicited acquisition proposals or offers for our capital stock that you may feel are in your best interest as one of our stockholders. ***These holders of our Class B common stock may have interests that differ from yours and may vote in a way with which you disagree and which may be adverse to your interests. This control may adversely affect the trading price of our Class A common stock. Despite no longer being employed by us, Paul Sciarra, one of our co-founders, remains able to exercise significant voting power. If we terminate our other co-founders' employment, they would also continue to have the ability to exercise significant voting power to the extent they were to retain their Class B common stock while our other existing holders disposed of their Class B common stock***.

(Emphasis added.)

114.    Shortly after taking the Company public, the Individual Defendants began heavily touting Pinterest's growth prospects and opportunities to make the platform more profitable to entice investors. In particular, the Individual Defendants focused on the purported room to expand

the domestic market (and international markets) and highlighted "strong trends in U.S. [ARPU]." However, the Individual Defendants were well aware that Pinterest was close to maximizing capacity in its domestic market base, making future growth in that market unlikely. Due to the Individual Defendants' statements to the contrary, investors were left in the dark about this significant trend and its inevitable consequences.

115.    The Company tracks the profits made on its platform by considering the Average Revenue per User ("ARPU"). This figure is calculated by dividing the average number of monthly active users ("MAUs") in a particular place by the total revenue in that region. Generally, the Company generates significantly more revenue from its U.S. users compared to its international users. For the year ended December 31, 2018, Pinterest reported ARPU in U.S. to be $9.04 per user, compared to ARPU internationally of $0.25 per user. The Company's ability to grow its MAUs domestically is thus vitally important to its financial success and growth prospects. Thus, this metric is also critical for investors and analysts of the Company.

116.    The Individual Defendants, as officers, directors, and controllers of the Company, would have been—or should have been aware of the market trends negatively impacting the Company—namely, that the domestic market in the U.S. was nearly saturated and there was little room for growth. Yet, they neglected to disclose material information to the investing public during the Relevant Period, rendering their statements false and misleading when made.

**The Individual Defendants' Duty to Disclose Downward U.S. User Market Trend**

117.    SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies, such as Pinterest, with respect to their finances and operations. Specifically, Item 303(a)(3) of Regulation S-K required Pinterest to:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from

continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

Describe any known trends or uncertainties that have had or that the   registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

118.    As such, the Individual Defendants had a duty pursuant to Regulation S-K to disclose the fact that the Company's domestic market was nearly saturated, and Pinterest would have little opportunity for expanded growth in the United States as a result, as these facts constituted (i) unusual transactions or significant economic changes materially affecting the Company's reporting income, (ii) known trends or uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income, and (iii) significant factors that would make investing in Pinterest  speculative or risky.

119.    Pursuant to Item 303(a)(3) of Regulation S-K, all Form 10-Qs and 10-Ks filed with the SEC were required to include a "Management's Discussion and Analysis of Financial Condition and Results of Operations" section describing, *inter alia*, (i) "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of income from continuing operations"; (ii) "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues"; and (iii) "(A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations."

120.    Therefore, the Individual Defendants had a duty to cause the Company to disclose

all material facts related to Pinterest's stalling domestic user base and the attendant risks to the Company's prospects. The negative market trend would foreseeably—and did impact the Company's financial performance and prospects.

### False and Misleading Statements Regarding Domestic User Growth and Prospects

#### *May 16, 2019 Press Release, Letter to Shareholders, and Earnings Call*

121.    On May 16, 2019, Pinterest issued a press release disclosing its first quarter results for the fiscal quarter ended March 31, 2019. The press release quoted Defendant Morgenfeld, who highlighted Pinterest's revenue growth, emphasizing the Company's revenue obtained from its domestic user base and stating, in relevant part, "We were particularly encouraged by the strength we saw in U.S. revenue and international user growth."

122.    The same day, the Company issued a letter to shareholders regarding Pinterest's financial performance for the quarter and the Company's outlook for anticipated revenue. The letter assured investors that Pinterest expected to "***maintain strong momentum in our business as we achieve larger scale. We expect revenue to grow 40%-43% compared to full-year 2018, driven by improving ARPU, particularly in the U.S. We expect to grow users in both the U.S. and International***." (Emphasis added.)

123.    On May 16, 2019, the Company also hosted an earnings call with investors to talk about Pinterest's quarterly performance. During the call, Defendant Morgenfeld reassured investors of continued expected growth and "comfortable room" in Pinterest's U.S. market, stating in relevant part, "[We] see comfortable room in all of our markets, in particular in international markets but also in the US, to continue to drive advertising content higher." In response to an inquiry regarding the amount of advertisers the Company had during the quarter, Defendant Morgenfeld maintained that the amount of advertisers was also growing and the Company expected that to continue.

### *May 17, 2019 Form 10-Q*

124.    On May 17, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendant Morgenfeld and non-party Tse Li Yang ("Yang") and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Silbermann and Morgenfeld attesting to the accuracy of the 1Q19 10-Q.

125.    The 1Q19 10-Q stated that Pinterest had reached 291 million MAUs, which was a 22% in growth year-over-year. The 1Q19 10-Q further touted growth in domestic revenue, a key metric of the Company's financial health and operations, stating in relevant part:

> Revenue for the three months ended March 31, 2019 increased by $70.6 million compared to the three months ended March 31, 2018. Revenue based on the geographic location of our users increased by 51% in the United States to $187.0 million and by 107% internationally to $14.9 million. ***U.S. revenue growth was driven by a 7% increase in average U.S. MAUs*** and a 41% increase in U.S. ARPU. International revenue growth was driven by a 30% increase in average international MAUs and a 59% increase in international ARPU. ***ARPU growth in the U.S. and internationally was driven by higher monetization of both of those user bases largely due to an increase in the number of advertisements delivered as a result of an increase in the overall number of advertisers on our platform and increased demand from existing advertisers.***

(Emphasis added.)

126.    The 1Q19 10-Q also stated that Pinterest's revenues from its domestic market in the United States, "is higher primarily due to our decision to focus our earliest monetization efforts there and also due to the relative size and maturity of the U.S. digital advertising market."

### *August 1, 2019 Press Release, Letter to Shareholders, and Earnings Call*

127.    On August 1, 2019, the Company issued a press release to discuss the Company's second quarter results for the fiscal quarter ended June 30, 2019. The press release quoted

Defendant Silbermann, who touted Pinterest's growth and diversification of its advertisers. The press release also quoted Defendant Morgenfeld, who also hyped up Pinterest's growth in its advertiser base, stating in relevant part that, "[t]he momentum we have seen over the past several quarters continued as more advertisers recognize the power of our platform to reach consumers." The press release also indicated that investors stated that Pinterest "remain[s] encouraged by trends in U.S. ARPU and by user growth in the international markets."

128.    The same day, the Company issued a letter to shareholders again highlighting the growth in Pinterest's MAUs and the "strong trends in U.S. average revenue per user (ARPU) and user growth in international markets." The letter further emphasized momentum in revenue from Pinterest's U.S. market, stating that ARPU had increased "41% year-over-year." The letter also provided encouraging (but unrealistic) guidance for 2019, stating in relevant part: "[w]e expect revenue to grow 45-48% in 2019 compared to full-year 2018, driven by improving ARPU, particularly in the U.S. We expect to grow users in both the U.S. and international. Consistent with trends in recent years, we expect to grow International users at a faster pace relative to the U.S."

129.    Pinterest also hosted a conference call on August 1, 2019, with investors to discuss its quarterly performance. Once again, the Individual Defendants overstated Pinterest's prospects. Defendant Silbermann boasted the Company's growth rate of 62% year-over-year and that the Company now had "more than 300 million people now using Pinterest every month." Defendant Morgenfeld reiterated Defendant Silbermann's overly positive expectations, stating in relevant part:

> [W]e continue to accelerate the growth in the number of advertisers on the platform. We talked last quarter about having done that and we accelerated yet again in the number of advertisers this quarter as well.

* * *

45

Longer term, we would expect price to continue to improve because advertisers tell us that they're getting a great return from their investment on Pinterest. So today the exercise is trying to get as many advertisers on the platform. So that they all see the value and help us build a lot more robust auction.

### *August 2, 2019 Form 10-Q*

130.    On August 2, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Morgenfeld and non-party Yang and contained SOX certifications signed by Defendants Silbermann and Morgenfeld attesting to the accuracy of the 2Q19 10-Q.

131.    The 2Q19 10-Q repeated attaining U.S. ARPU of $2.80, representing growth of 41% when compared with the prior year's second quarter performance. With respect to the Company's revenues obtained internationally and domestically, the 2Q19 10-Q reported:

> For the three and six months ended June 30, 2019, *U.S. revenue growth was driven by 41% and 39% respective increases in U.S. ARPU supported by a 13% increase in U.S. MAUs,* and international revenue growth was driven by 123% and 89% respective increases in international ARPU supported by a 38% increase in international MAUs. *ARPU growth in the U.S. and internationally was driven by higher monetization of both of those user bases largely due to an increase in advertising demand from new and existing advertisers on our platform.* This resulted in an increase in the number of advertisements served as well as an increase in the price of advertisements, but the impact of the latter was not significant.

(Emphasis added.)

132.    The statements referenced above in ¶¶121–131 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) Pinterest's domestic market in the United States was nearly saturated; (2) the Company's potential to capitalize on the average revenue for each domestic-based user was thereby substantially diminished; (3) consequently, Pinterest faced a heightened risk for losing revenues from advertising and; (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading. The purported risk factors supposedly disclosed by the Company

were inadequate as they were boilerplate and generalized at a time when the Individual Defendants were aware of concrete and ongoing issues with their primary products.

## **The Truth About Pinterest's Domestic User Growth Emerges**

133.    Finally, on October 31, 2019, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2019. The Company also issued a letter to its shareholders the same day, attached to a current report filed with the SEC on Form 8-K. The press release and letter provided highlights of the Company's third quarter financial performance, including its quarterly revenue growth. In stark contrast to the Individual Defendants' repeated assurances and overly positive projections, the press release and letter to shareholders revealed disheartening results. Specifically, both disclosures reported 87 million MAUs in the U.S., a meager 8% growth in U.S. MAUs year-over-year. Notably, the 87 million figure was lower than the previous quarter and also lower compared to a 2-year basis.

134.    The Company severely missed analyst revenue targets for the Company on its most important performance metric, revenues secured through U.S.-based advertising. The Company also reported total quarterly revenue of $279.7 million. This amount also missed Wall Street's consensus projections of $282 million. The Company's revenue from U.S. advertising was reported to be $251 million, also missing the mark compared to projected revenue of $265 million. The Company also increased its guidance for the full year of 2019, indicating more disappointing performance was still to come.

135.    On this news, the price of the Company's stock fell approximately 17%, or $4.28, tumbling from $25.14 per share at the close of trading on October 31, 2019 to $20.86 per share at the close of trading on November 1, 2019.

136.    The Company's unexpected financial performance shocked the investing public, who had been primed for months to expect much better results. On November 1, 2019, the Company hosted an earnings call to discuss the quarterly results. During the call, the Individual Defendants tried to do damage control by deflecting from the negative results and focusing on Pinterest's overall growth in MAUs. In response to analyst Mark Mahaney of RBC, who questioned the "notable deceleration" in the Company's ARPUs in the U.S. as well as its growth prospects, Defendant Morgenfeld dodged the question and emphasized the Company's 47% growth rate overall. Defendant Morgenfeld further commented on Pinterest's potential growth, stating that:

> And so as we think about growth going forward, it's really going to stem, especially in the US, around two new product areas that have been – we've been focused on now and talked about for some time, but will scale going forward. They will drive advertiser diversification, and those two areas are shopping and SMB.

137.    Defendant Morgenfeld again deflected from Justin Post of Bank America's prompting to give insight into Pinterest's full year guidance for 2019, which seemed to indicate further downward trends in the coming quarter, stating in relevant part:

> I go back to the fundamental principle here is that we're investing in a bunch of new things around advertiser diversification that I think will bear fruit over the coming several quarters and years. Those are principally around international coverage and around our mid-market and SMB presence, which I'm delighted with the progress we're making, but it's just going to be a journey.

138.    Despite the Individual Defendants' efforts to avert attention from Pinterest's disappointing financial results, analysts promptly lowered their price targets for the Company and reported on the unfortunate news in time for Halloween. *The Motley Fool* reported "Pinterest's Q3 Earnings Report Spooks the Market; Stock Plunges 20%" and stated, "Pinterest [] reported third-quarter 2019 results after the closing bell on Thursday that the market decisively considered a Halloween trick, rather than a treat."  Pivotal Research Group lowered their price target of

Pinterest by more than 25% (from $32 to $23.5) after issuing a report stating that the "deceleration in the US advertising was far more than we had hoped for," noting that, "we got this one DEAD wrong." Likewise, a report by Deutsche Bank titled, "No candy at this house tonight," labeled the growth in Pinterest's U.S. users "uninspiring" and stated that the Company "clearly needs more feet on the street to move the needle on revenue and here the company is moving more slowly." Deutsche Bank also lowered its price target for Pinterest by over 15% (from $39 to $32).

### The Discriminatory Misconduct

139.     In addition to the aforementioned misconduct, the Individual Defendants engaged in and/or permitted the Discriminatory Misconduct. The Individual Defendants allowed multiple violations of state and federal law and Pinterest's corporate governance policies to occur that injured the company. These violations included, but were not limited to, engaging in and allowing the Discriminatory Misconduct, which included both gender and race-based discrimination against female and Black employees, bias, and retaliation, and widespread violations of the Company's Code of Conduct and governance committee charters and guidelines.

140.     Before the Company went public, two-thirds of Pinterest's 250 million users at the time were female, mostly mothers who were able to purchase many of the household products and services advertised on the platform. Today, women continue to make up a significant majority of Pinterest's active user base. Pinterest is well aware of its target market and describes the Company as a "productivity tool for planning your dreams." The Company's annual report filed with the SEC on Form 10-K on February 7, 2020 outlined, in relevant part:

> *Valuable Audience.* Pinterest reaches 335 million monthly active users, two-thirds of whom are female. As of December 2019, our total audience includes 47% of internet users in the United States, according to data from Comscore based on total unique visitors to our service. This includes eight out of 10 moms, who are often the primary decision-makers when it comes to buying products and services for their household, as well as more than half of all U.S. millennials ages 18-34.

141.   As detailed above, Pinterest tracks its profitability through the ARPU. These figures also attract advertisers to partner with Pinterest for their products and services. To attract and maintain its users (the primary business goal for growth and success) the Company must know its users' preferences and reflect those preferences accordingly.

142.   Early on, the Company established itself as distinct from other tech companies, with the first rule on its etiquette page being, "Be nice." This image was unlike other fast-growing aggressive social media companies in Silicon Valley. According to the Company's website, Pinterest purports to be, "creating a company that includes all people, and building a product that reflects our diverse population of 415+ million Pinners." In its "Careers" tab on its website, Pinterest markets its commitment to inclusion and diversity, claiming that, "[w]e're looking for all kinds of people. To build an app that's used and loved by people all around the world, we need a team with all kinds of different perspectives, experiences and backgrounds."

143.   In 2015, Pinterest announced efforts to increase diversity within the Company. The Individual Defendant maintained these sentiments as they took the Company public in 2019. In a "Founder's Journey" feature on Defendant Sharp on Bessemer's website, Defendant Sharp stated that "[d]iverse perspectives – from both people on our teams and people on our teams and people using on products – are invaluable . . . It's hard to solve for the real problem if you can't relate to someone's real experience." Defendant Sharp also maintained that a diverse workforce "produce[s] the best outcomes for our users." In early 2020, the Company's Chief Human Resources Officer reported that, "research shows that diverse teams make us more creative, diligent and hard working. When we are building products, a team of people with different backgrounds enables us to think through products, policies, and safety from all angles . . . Inclusion and diversity is not only a value; it's foundational to making the best decisions and building the

strongest teams over time." However, the Defendants' representations were merely lip-service, as former Company employees would expose in the summer of 2020.

144.    Before Pinterest's double standards were fully unmasked, the threads holding the Company's superficial image of a nice inclusive work culture together began to unravel. In January 2020, *USA Today* reported that Ben Horowitz, the co-founder of one of Pinterest's largest stockholders, Andreessen Horowitz (which also employs Defendant Jordan), made inappropriate comparisons at a Company fireside chat between corporate culture and prison shanking for employees to draw lessons from. The article reported one Company employee stating, "I'm extraordinarily uncomfortable with using slavery and prison culture as 'good examples' for drawing the lessons we need to draw, [. . . ] To use a man's need to survive in prison and turning it into a joke for how that's like new hire orientation. Just…"

145.    According to recent figures released by Pinterest, only 4% of its employees are Black. Only 1%-2% of Pinterest's leadership is Black or Hispanic/Latinix, while 64% of its leadership is White. Although the Company's employees are 47% female, within Pinterest's leadership rank, that percent is a mere 25%:



***The Individual Defendants Facilitate a Toxic Culture that Allowed for Race and Gender-Based Pay Disparity and Discrimination***

146.     Beginning on June 15, 2020 and continuing thereafter, former Pinterest employees began publicly disclosing the hypocrisy at the Company. Ozoma was a graduate of Yale and had previously worked at both Google and Facebook. When Ozoma was recruited to join Pinterest, she was told that she would be heading the Company's policy group in the United States, developing strategic relationships with agencies and organizations, including the Center for Disease Control and National Suicide Prevention Lifeline. Whereas other social media companies had large established policy teams, the opportunity at Pinterest provided Ozoma the chance to build a policy team from the beginning. When she joined, only one other person served on the team, Charlie Hale ("Hale"). Ozoma promptly implemented numerous policy initiatives upon joining Pinterest as its Public Policy and Social Impact Manager and played a vital role in the Company's efforts to quell the dissemination of health misinformation. Although she brought the Company much success, she soon learned that her compensation was not as she anticipated and she was actually paid significantly less than Hale, her White male counterpart. This was in spite of the fact that (1) she

and Hale split their work equally; and (2) she had more relevant experience than Hale. A few months after she started at the Company, she learned of Pinterest's Public Policy level chart—a leveling criteria utilized by the Company to determine compensation arrangements. Although Ozoma had extensively negotiated her salary before signing on with the Company, in September 2018, she learned that she had been hired at a level four—while Hale had been hired at a level eight (the highest level). According to an investigation conducted by *Business Insider*, Hale was one of the members of Silbermann's inner circle.

147.    Ozoma quickly made her concerns known and Hale assured her that her pay would be addressed at the end of the year during the performance cycle. The end of the year came and went, and no meaningful action was taken. Ozoma did not give up hope and continued to work diligently for the Company. She collaborated with the Company's Trust and Safety team to establish content moderation policies to protect users from negative experiences on the platform. She also developed a policy to prevent misinformation and disinformation, which the Company was still using when she left in May 2020. The Company enacted its anti-vaccination prohibition policy in February 2019.  The policy was widely praised in the media and allowed the Company to have a more successful IPO, with a $19 per share price and a $10 billion valuation.

148.    Still, after the IPO, Ozoma still struggled to receive fair pair for her position and work. In May 2019, she hired a lawyer, who argued that she should have been hired at a level six, at least. The Company attributed her pay level to her years of experience—a factor that was not part of Pinterest's leveling chart. During the same time period, the Company held a women's group event internally, where Company supervisors, including Hale, were advising female employees on how to negotiate for their compensation. During the event, Hale stated that employees should "adjust [their] expectations," and "only ask for what you deserve." As he made these comments,

he was staring directly at Ozoma—who had been trying for several months to have her compensation adjusted. Ozoma understood Hale's message as a public attack on her for requesting a salary increase. The message was loud and clear, she was asking for more than she deserved.

149.    In her Twitter post, Ozoma revealed that she had complained internally about unfair pay discrimination as early as January 2019. Ozoma also raised concerns about her manager, who she claims harassed her through "racism, gaslighting and disrespect." She also called the Company out for failing to respond to her complaints of online harassment and cyberbullying, among other security and privacy concerns, that she raised after one of her colleagues leaked her personal information to an extremist website, Project Veritas. Because the Individual Defendants failed to act to protect her security and information, Ozoma was forced to hire a social media intelligence agency, Storyful, to protect her and monitor the situation.

150.    Moreover, while Pinterest was praised for taking action to stop the promotion of slave plantations for wedding venues—an initiative spearheaded by Ozoma—internally, she was criticized for suggesting a ban as opposed to other options to address the issue.

151.    Banks joined the Company's public policy team in the midst of Ozoma's internal battle for fair treatment and pay in May 2019. Banks, like Ozoma, had an impressive background. She was educated at Oxford University and worked at Google before coming to Pinterest to head the Company's office in Washington, D.C.

152.    Banks was hired as Hale's equal partner—or at least, that is what she was told. Banks is half Black and half Japanese. The Company was keen taking advantage of her connections in Washington, D.C., and her background work with racial equality. Banks, too, did not see the Public Policy level chart until after she was hired. While negotiating her salary, she was falsely told that Ozoma played a role in creating the Public Policy level chart. She was also misinformed

that Ozoma was involved in the hiring process, which she was not. Banks was hired at a higher level than Ozoma, but one that was still lower than her rightful station. Like Ozoma, Banks was undeterred and continued to work hard at the Company. Among other things, Banks served as the Company's liaison with government officials. She also managed the division of labor for her team.

153.   When Banks took her story public on Twitter, she complained that her manager made "disparaging comments" about her ethnicity. Although she reported the incident to human resources, no meaningful action was taken. The Company purportedly investigated the complaint and found that the comments, which referred to the origin of ramen noodles, did not indicate bias and were not a violation on their own of the Code of Conduct.

154.   In June 2019, after the Company decided to block content from LiveAction in the for violating Pinterest's policies and disseminating "harmful misinformation, [which] includes medical misinformation and conspiracies that turn individuals and facilities into targets for harassment or violence[,]" Ozoma's personal information was leaked over the internet by a White male colleague. Ozoma informed Hale and others at the Company, including legal counsel, but no one at the Company took any meaningful action. Even when it was clear that LiveAction was promptly publishing information about Pinterest that could only have come from an internal source, the Company's leadership either ignored or outright denied Ozoma's warnings and pleas for the Company to do something. LiveAction began publishing employee Slack conversations, placing Pinterest's employees at risk for "doxxing," a form of online harassment targeting women (primarily women of color) with violent threats. Both Ozoma and Banks emailed the Company's leadership, including legal counsel to take preemptive action to protect employees from the imminent threat of being doxxed. Banks and Ozoma were familiar with the doxxing process through their former co-workers' experiences at Twitter and Google. Still, no meaningful action

was taken. Due to the Individual Defendants' biases against Ozoma and Banks, they effectively endorsed the harassment of Pinterest's employees by choosing to tune out employee concerns for their safety and the safety of other employees at the Company. Ozoma's contact information and picture were shared widely across the internet, including on forums known for circulating hateful propaganda. Ozoma sent numerous emails pleading for someone to take action to protect her security. No response. She was thereafter subjected to a host of death and rape threats over the internet. At least two other employees were also doxxed. Hours later, someone from the Company's legal team responded and told Ozoma to figure it out on her own by reaching out to a third party she previously worked with during her health misinformation initiative. The Company's purported investigation was equally disappointing. According to Ozoma, "[i]nstead of focusing on security and making sure that we were fine and validating the concerns that we had, their concern was: Is what you said valid? Almost like [the employee] had a legitimate reason to share my personal information all over the Internet." Although Defendant Silbermann promised Ozoma he would look into the issue after she expressed her disappointment with the Company's handling of the situation, no follow up was made. Eventually, more than a week later, the Company made efforts to remove employees' information off the internet.

155.    In July 2019, Ozoma filed a complaint with the California Department of Fair Employment and Housing against Pinterest, for persistently failing to increase her pay. A few months later, in September 2019, Banks complained to human resources that Hale had been discriminating against her, including by criticizing her "tone." Human resources maintained that Hale's intent was not ill, so his comments were not considered biased. Instead of requiring Hale to have coaching or other training, he was let off the hook. He was, after all, part of Defendant Silbermann's inner circle and was privileged with that protection.

156.    As the months passed, Banks and Ozoma continued to hit walls in their attempts to voice their concerns at the Company. Hale actively ignored Banks' requests for information about the promotion process at the Company in advance of her performance review and once again, Banks was forced to take her issues up with the human resource department. In November 2019, the public policy team, including Hale, decided to recommend that Pinterest reverse a decision it made that took away contractors' holiday pay. However, during the presentation, Hale stayed on the sidelines, leaving Banks and Ozoma to present the issue unsupported. The proposal was not well received. While the Company eventually did overturn the rule, Banks was demoted and berated in connection with the proposal. Thereafter, the Company's legal team led an aggressive targeted interrogation over the proposal and over whether Ozoma and/or Banks leaked information about the Company's decisions to the media. Several co-workers were roped into the investigation and subjected to forceful interrogations. Some employees were even fired or decided to leave the Company after their interrogation. The Company's aggressive investigation against Ozoma and Banks was starkly different from the purported investigation made in connection with Ozoma and Banks' security concerns earlier that year.

157.    Despite the continued challenges, including what now seemed to be an effort to frame Ozoma and Banks for allegedly leaking information to the press, they both remained diligent in their duties. In December 2019, Ozoma successfully championed the policy initiative of banning the promotion of slave plantations for wedding venues. The Company was highly praised for its decision to do so. Outwardly, Pinterest praised its diverse and inclusive environment and readily took credit for Ozoma's policy strides. Yet, the same month, Ozoma received a retaliatory performance review connected to the very same recommendation the Company received so much praise for. Hale's critique was that she did not explore both sides of the issue when she elected for

an outright ban; she did not consider/present the positive aspects of weddings at slave plantations. The hope for any meaningful increase in Ozoma's pay was becoming more out of reach.

158.    In January 2020, after multiple failed attempts to address her own pay discrimination, Banks filed a complaint with the California Department of Fair Employment and Housing. Her allegations included pay discrimination on the basis of sex and race and retaliation for reporting the discrimination. In February 2020, Banks was granted the right to sue. However, the retaliation continued when the Company began challenging Company money she spent on Black organizations—even though her partnerships with those organizations was a primary reason she was hired. Finally, Banks and Ozoma decided they had enough and left the Company on May 22, 2020.

159.    A few days later, after the killing of George Floyd and the rejuvenation of race justice in the United States, the Company published the following statement: "With everything we do, we will make it clear that our Black employees matter, Black Pinners and creators matter, and Black Lives matter."

160.    On June 15, 2020, enraged by the two-faced message, Ozoma and Banks decided to take their stories public. Among other things, Ozoma disclosed that she lost hundreds of thousands of dollars' worth of stock options due to the Company's improper pay assignment. Ozoma and Banks' posts included the following:



161.    The posts quickly went viral, capturing the attention of high-profile celebrities and prompting other former employees to come forth with similar stories of racism, sexism, retaliation, harassment, and bias.

162.    Ozoma and Banks' stories were widely covered by multiple media sources. One organization, Color of Change, issued a statement that was nationwide titled, "Pinterest's Hypocrisy is Glaring." The statement asserted, "[w]e credit them for orienting the company's policies toward racial justice. However, even while claiming 'Black lives matter,' Pinterest sidelined Ifeoma and Aerica after they made the platform safer for Black users. To make matters worse, the company's leadership failed to intervene after Ifeoma was doxxed by another Pinterest employee." Other media outlets, including *The Washington Post*, *Business Insider*, and *NPR*,

among others published scathing articles scrutinizing the Company and its "toxic chaotic culture."

163.    An investigative piece by *Business Insider*, published on June 20, 2020 included information gleaned from interviewing eleven former employees, who confirmed that Pinterest's work environment was a "dog-eat-dog culture that they believe goes well beyond the 'brilliant jerk' standard that's accepted at many Silicon Valley companies." With its outward appearance, employees were "duped" into thinking that they actually would be working in "the last positive corner on the internet." According to the article:

> . . . Black employees [] were suddenly fired or 'pushed out' after meeting or exceeding their performance goals.
>
> * * *
>
> Poor management skills created a culture of firing that left everyone fighting for recognition.
>
> * * *
>
> Internal teams felt pitted against each other, taking credit for each other's work.
>
> * * *
>
> Multiple people said they suffered stress-induced conditions. Some said they required medical treatment ranging from 'stroke level' high blood pressure to clinical depression and PTSD.
>
> * * *
>
> Many women believed they were underpaid compared to what male coworkers were earning.
>
> * * *
>
> When complaints were made to human resources, HR routinely sided with managers, multiple people said. Those employees then often received negative reviews, despite meeting performance goals, while managers were promoted, they said.

164.    As further revealed by *Business Insider's* investigation, employee complaints "went into the garbage" and when they followed up on filed reports or made new complaints, they were assigned a new representative who was unfamiliar with their prior complaints.  For Black employees, the Company was a "revolving door[.]" At least eight former Black employees serving

in various capacities at the Company left within two years. Many of those employees reported that they were discriminated against and otherwise treated inappropriately. One Black former employee stated that he was "pushed out" at the end of the year in 2019, after he successfully made millions of dollars for the Company in sales from a high-profile client. The account was thereafter reassigned to a White male employee. Meanwhile, the Black former employee was ostracized from meetings and received a negative performance review. As Business Insider reported, other Black salespeople had similar experiences. Two Black female employees were mistreated by their White managers, one was publicly berated for supposedly taking too much time off because she was a mother, and the other was forced to do personal chores for her White female manager, who went so far as to blame the Black employee when the manager had a urinary tract infection for failing to schedule her breaks.

165.    With so much negative publicity, the Individual Defendants were forced to address the allegations seriously. In late June 2020, after initially downplaying the claims made by Banks and Ozoma, Defendant Silbermann admitted that "parts of our culture are broken" and acknowledged in an internal email, "I'm embarrassed to say that I didn't understand the depth of the hardship and hurt many of our team members have experienced . . . . I need to do better. My leaders need to do better. And Pinterest needs to be better." He also listed out steps to improve the Company's representation in its leadership and ways to understand and tackle racism and bias. The Company announced thereafter that the law firm, WilmerHale, was hired to review Pinterest's policies and practices related to discrimination, harassment, and other workplace issues."

166.    Ozoma and Banks shared their stories with multiple news outlets and were invited to speak about their experiences on the Today Show in July 2020. Banks disclosed that the mistreatment she experienced at the Company pushed her to take medication for depression and

anxiety. They both shared that the claims made with the California Department of Fair Employment and Housing had been confidentially resolved. The same month, Banks was interviewed on a podcast where she juxtaposed her experience at Pinterest with Google and with the White House working for the Obama administration. Pinterest, she asserted, was "the most unethical, most hypocritical, and most unprofessional environment I've ever been in my life." She further complained that the internal reporting process was overseen by the Company's legal team and her manager, Hales, both of which were the subject of Banks' complaints, biasing the process altogether. She also pointed out the advertising losses the Company now faced in light of the negative publicity surrounding the scandal.

167.    Also in July 2020, *The Washington Post* covered the stories of Ozoma and Banks in detail in an article that also included interviews with other former employees of the Company. The article shared numerous stories from former Black employees, female and male, who had experienced discrimination in so many forms. One employee was outrageously told during a team dinner that she should be "the servant" and "serve" her colleagues. The fear of retaliation disabled many of these former employees from reporting incidents to the Company's human resource department. The same month, the most popular tech magazine, Fast Company, also reported on the discrimination claims lodged against Pinterest and the inappropriateness of the Company's pay level charts.

168.    Pandora's box had been opened, and all of Pinterest's demons were surfacing. On August 11, 2020, one of Pinterest's highest former executives, its COO, Brougher, filed a lawsuit in the Superior Court of the State of California alleging gender-based discrimination and retaliation. She also published an article on Medium titled, "The Pinterest Paradox: Cupcakes and Toxicity."

169.    Brougher's story aligned in many ways with the stories of Ozoma and Banks. Brougher came to Pinterest in March 2018 with lofty credentials, having worked at Google, Square, and Charles Schwab. She was the Company's first COO and was brought on board to assist Defendant Silbermann with taking the Company public in its IPO. Brougher's depth of experience made her the perfect fit for the job. During her tenure at the Company, Pinterest's revenue ballooned from $500 million to $1.1 billion and the Company's advertisers increased by 8x, from 10,000 to 80,000, just in a short two-year time period. The Company also expanded its operations to 20 countries. Brougher oversaw half of the Company's employees. Brougher successfully led her teams and helped Pinterest gain positive coverage in the press. However, some of the Company's operations stayed under the control of Defendant Morgenfeld.

170.    Brougher, like Ozoma and Banks before her, found out she was being underpaid after she began working for the Company. When she was hired, the Company's Board, which included Defendants Silbermann, Jordan, Wilson, and Reynolds, approved her compensation and informed Brougher that executives would receive backloaded grants, i.e., grants that did not immediately vest. Brougher believed that all executives had similar equity structures. However, when the Company was preparing to go public, Brougher discovered in March 2019 that male executives had better vesting schedules with less or no backloading. Defendant Morgenfeld in particular, Brougher's counterpart, received 812,500 shares his first year, compared to Brougher's 300,000, which was 63% less than Morgenfeld's award. During the IPO, these shares were worth $15.4 million versus $5.7 million, respectively. Morgenfeld was also entitled to receive his shares outright. Pursuant to Brougher's equity arrangement, her shares vested over *five years*: 10% after the first year, 20% the second, 30% the third, 40% the fourth year, and 45% the fifth year. Her compensation arrangement was less favorable than other officers as well. Notably, Brougher was

excluded from attending the Company's roadshow before the IPO—even though she was the Company's second most senior officer and was hired for her experience with IPOs. Instead, Defendant Silbermann took a male friend of his, who was Head of Global Communication and whose position overlapped with another attendee, the Head of Investor Relations.

171.    Brougher brought her concerns to Silbermann, directly, but he told her to take it up with human resources. Through her complaint, her compensation was eventually adjusted, but only after a significant uphill battle to prove the inequity. The modifications made, however, did not correct all of Brougher's concerns, nor did her complaint have any impact on the unfair equity arrangements of other female officers. Brougher's complaints were swiftly followed by retaliation and discrimination. She was ostracized from Company decisions, kept out of meetings, and discouraged from communicating. Brougher maintained that Defendant Silbermann's "appeared to listen to only a few people and sealed himself off from opposing viewpoints. Ben's 'in group,' the men invited to 'meeting after meeting,' held all the power and influence." Brougher maintains that her exclusion harmed the Company's revenue after the IPO. When she complained to Defendant Silbermann, she was excluded from more meetings and effectively prevented from doing her job. When Brougher raised issues with the Company, strategies, or other decisions, Defendant Silbermann accused Brougher of not being collaborative and not having consistently healthy cross-functional relationships. Rather than give her specific examples, Defendant Silbermann cautioned Brougher to "be mindful." Because she was a woman, she was not allowed to exercise the type of candor and assertiveness that commonly came from men in leadership positions. During her performance review, Defendant Silbermann failed to acknowledge the revenue growth she achieved for the Company. Instead, her review focused on her relationships.

172.    By January 2020, Brougher's relationship with Morgenfeld began to deteriorate

significantly. Defendant Morgenfeld often ignored her and undermined her authority, bypassing her to talk with her team members, even when he was aware that she was leading certain projects. Defendant Morgenfeld was increasingly disrespectful to Brougher, on one occasion questioning her at a meeting by stating, "What is your job anyway?" The one-to-one meetings between Brougher and Morgenfeld were removed from the calendar. The next month, Defendant Morgenfeld conducted a peer review of Brougher, though she was not asked to give him one, despite the Company's policy. The only comment Morgenfeld made about Brougher's achievements was that she "[s]eems to be a champion for diversity issues." When she expressed concern about her review to Defendant Silbermann, he simply told her to approach the problem with "curiosity." Brougher confronted Defendant Morgenfeld, who reacted aggressively and called her a liar. He maintained that she was a champion for women's issues, further downplaying and ignoring any of her achievements at the Company. Defendant Silbermann minimized Brougher's concerns and made clear that he would not be involved in what he likened to a couple arguing over coffee. Brougher thereafter took her complaints to human resources. Instead of trying to resolve the issue, human resources escalated it to the legal department. At this point, communication between Brougher and Morgenfeld had completely broken down. In March, Brougher was informed that the Company had investigated Morgenfeld's behavior and found nothing amiss. Brougher communicated to human resources that she would need assistance to repair the working relationship between her and Morgenfeld. She received no response.

173.    In Aril 2020, Defendant Silbermann called Brougher and fired her, asking her to transfer her responsibilities to Morgenfeld. Silbermann expressed that he was "sad" to fire her and vaguely stated that her cross-functional relationships were the reason he was doing so. Defendant Silbermann then boldly asked Brougher to tell her team the decision to leave was *hers* and offered

her a non-disclosure agreement. Brougher, declined. According to Brougher, her termination resulted in her losing tens of millions of dollars in earnings and equity compensation.

174.    In her August 11, 2020 article, Brougher made clear that she believed she was fired for calling out the widespread discrimination at the Company, misogyny, and the toxic work environment. Her story was thereafter covered by *The New York Times* in an article covering gender discrimination at the Company. Defendant Silbermann was interviewed for the article. In response to a question from Kara Swisher regarding the lack of female presence on the Company's management page on its website, Defendant Silbermann stated, "I had no idea." The webpage was quickly refreshed with additional employees who were more diverse. The article included interviews from former female employees who confirmed the male-dominated culture permeating the Company.

175.    More articles followed and employees continued to speak out on social media and in the press about similar experiences at the Company. One former employee, as quoted in an *Axios* article on August 13, 2020 stated, "[a]nyone who has worked at Pinterest knows that culture starts from the top with Ben which is reinforced by his small band of male cronies . . . For too long, Ben has claimed to not understand what's going on at his own company. The time is up for Ben Silbermann."

176.    A few days later, on August 14, 2020, Pinterest employees staged a virtual walk-out to protest the gender and race-based discrimination at the Company. Employees were encouraged to post messages on their Slack boards to express how they felt about the misconduct and to share the website facilitating the walkout, changeatpinterest.com. A petition was also circulated to demand transparency and more representation within the Company's leadership.

177.    In September 2020, more Pinterest employee stories of discrimination emerged.

*The Verge* reported on September 11, 2020 on an employee who served in Pinterest's finance department, McKenna Rogers. The article included statements from four employee interviews describing "unequal treatment for women and people of color in the [finance] department, including inappropriate comments from managers and unequal pay and leveling." Rogers reported to a manager who often broke his professionalism around her and treated her disrespectfully. Rogers had few places to go to within the Company to report her manager's inappropriate behavior. The relationship between the two deteriorated further after her manager heard about a feedback Rogers wrote about him on a Company survey—which she assumed would be confidential. Eventually, Rogers took the issue up with human resources. During the time of her report, she complained of being actively ignored by her boss and passed over for assignments. Human resources investigated the issue and agreed to allow for a mediated meeting between the two. Having a representative from human resources did not prevent her boss from losing his temper during the meeting. Rogers soon developed post-traumatic stress disorder and severe depression due to the toxic work relationship and decided she needed to leave the Company. She expressed her reason for leaving and was met with no response. Several other employees reported to *The Verge* and elsewhere similar tales of inequity, harassment, and other mistreatment. Many of these employees had expressed their concerns to Defendant Silbermann, Sharp, and others at the Company. Defendant Sharp served as the executive sponsor for the Black employees' group and was aware that inequity was a widespread issue within the Company. Yet, Defendant Sharp failed to investigate or take other action to monitor, prevent, or correct the situation.

178.   The Individual Defendant's failures have irreparably damaged the Company. On December 14, 2020, the Company disclosed in a current report filed on Form 8-K with the SEC that it was settling Brougher's lawsuit for an unprecedented ***$22.5 million***. The settlement includes

a $2.5 million investment "to be used towards advancing women and underrepresented communities in the tech industry." According to CNN:

> The settlement brings to an end one of the most high-profile gender discrimination cases in Silicon Valley in recent memory. Brougher's lawsuit, as well as allegations of racism and discrimination from two other former Pinterest employees in June, rattled the staff of the digital scrapbooking service, which is known for being a feel-good online destination.

179.    The Individual Defendants, including the Company's Board, condoned a hostile workplace culture at the Company, where female employees and employees of color were marginalized, harassed, and discriminated against for *years*. It was not until the Company's image had been dragged through the mud that any meaningful change took place at the Company.

180.    Ozoma, Banks, and Brougher, among others, exposed that the Company's female employees, including those in leadership positions were, *inter alia*, "berated . . . pushed out without warning, and executives in Silbermann's inner circle faced no consequences despite repeated complaints." Women at the Company were subjected to discriminatory pay and marginalization and were eventually pushed out of the Company, one way or another.

181.    The Company's Board assumes accountability for confirming that Pinterest follows federal and state laws that prohibit gender and racial discrimination. For most of the Relevant Period, until just recently, not one member of the Company's Board was Black or otherwise racially diverse. Instead, the overwhelming majority were, in fact, White men.

182.    The Individual Defendants have known for a long time that Pinterest has been violating federal and state laws regarding diversity and discrimination and yet the Individual Defendants repeatedly refused to nominate, appoint, or hire a Black or other underrepresented minority individual to the Board until they were effectively forced to after the significant reputational damaged the Company experienced when the public learned the truth of the

Discriminatory Misconduct. Through their actions and inactions, the Individual Defendants utterly failed in their duties to the Company.

### *Social Justice Corporate Initiatives in 2020*

183.    While the Individual Defendants have caused Pinterest to adopt discriminatory policies and fail to sincerely keep up with the times internally, the rest of corporate America, including the tech industry,[5] has not only been publicly condemning racism, but have gone beyond superficial lip-service, implementing social justice initiatives at a rapid pace to combat systemic racism in America in response to public outrage over the murders of, among many others, George Floyd, Breonna Taylor, and Ahmaud Arbery.[6] For instance: (1) Microsoft, Intel, and Johnson & Johnson have pledged to tie executive pay to certain diversity figures; (2) Apple has, for the past five years, increased its hiring of women and historically underrepresented groups in tech from 21% in 2014 to 31% in 2018, and has committed to "increase representation in leadership across the company[]"; (3) PepsiCo announced a five-year, $400 million initiative that includes the goal of increasing Black managerial representation by 30% and more than doubling business with Black-owned suppliers; and (5) Alexis Ohanian, the co-founder of Reddit, resigned from Reddit's all-White board, advocated that his seat be filled by a Black individual, and further pledged to use future gains on his Reddit stock to serve the Black community, beginning with Colin Kaepernick's Know Your Rights Camp.

184.    Although Pinterest has finally added diverse members to its Board in the wake of public outrage against the Company's failings, the Company still has much room for growth to correct its internal culture and ensure diverse employees in leadership and at all levels are retained.

---

[5]    https://www.cio.com/article/3570512/how-top-tech-companies-are-addressing-diversity-and-inclusion.html?page=2. Last visited December 7, 2020.

[6]    https://www.forbes.com/sites/davidhessekiel/2020/06/04/companies-taking-a-public-stand-in-the-wake-of-george-floyds-death/?sh=e62ec4172148. Last visited December 7, 2020.

### *Lack of Term Limits as Cause for Concern and Method to Discriminate*

185.    According to a report by the Harvard Law School Forum on Corporate Governance, longer-tenured directors do not serve the best interests of the Company. The report stated the following, in relevant part:

> Investor respondents to ISS' 2016–2017 Global Policy Survey (conducted between Aug. 2, 2016 and Aug. 30, 2016) were asked which tenure-related factors — with multiple answers allowed — would give rise to concern about a board's nominating and refreshment processes. ***Among the 120 institutional investors (one-third of whom each own or manage assets in excess of $100 billion) who responded, 68 percent pointed to a high proportion of directors with long tenure as cause for concern, 53 percent identified an absence of newly-appointed independent directors in recent years as a potential problem, and 51 percent flagged lengthy average tenure as problematic.*** Just 11 percent of the investor respondents said that tenure is not a concern, although even several of those respondents indicated that an absence of newly-appointed directors is a concern.

(Emphasis added.)

186.    Thus, contrary to the Company's contention within its Corporate Governance Guidelines, losing longstanding directors does not outweigh the benefits of incorporating new ideas and viewpoints from individuals with diverse backgrounds on the Board.

### *April 9, 2020 Proxy Statement*

187.    On April 9, 2020, the Company filed the 2020 Proxy Statement with the SEC. Defendants Silbermann, Jordan, Kilgore, Levine, Reynolds, Rajaram and Wilson, solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions relating to the Discriminatory Misconduct.[7]

---

[7] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

188.    The 2020 Proxy Statement also called for shareholders to: (1) elect three Class I director nominees; (2) ratify Ernst & Young as the Company's independent auditor for fiscal year 2020 and; (3) approve on an advisory basis the frequency of advisory voting on executive compensation.

189.    The 2020 Proxy Statement was false and misleading because, despite noting that the Company maintains a "code of business conduct and ethics applicable to our directors and employees, including our chief executive officer, chief financial officer and other executive officers and all persons performing similar functions[]" the Code of Conduct was not followed, as evidenced by the Discriminatory Misconduct, numerous false and misleading statements relating to the Discriminatory Misconduct as alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

190.    The 2020 Proxy Statement was also false and misleading with respect to Pinterest's compensation policies and practices in that it purportedly "[l]ink[ed] pay with performance." Specifically, the 2020 Proxy Statement maintained in relevant part that:

> **Linking pay with performance.** As described above, the majority of our NEOs' target total direct compensation is linked to the value of our stock, which will reflect how we create value over the long term. In addition, executives are eligible to receive periodic grants following the annual review cycle. When determining the amount of such awards, the compensation committee considers the company's performance as measured against financial, operational and strategic objectives as well as each named executive officer's individual contribution to that performance.

191.    The 2020 Proxy Statement also misrepresented the manner in which executive officer compensation is decided, stating in relevant part:

> • each of our named executive officer's roles and responsibilities, qualifications, knowledge, skills, experience, and tenure, including on a relative basis to other similarly situated executives at the companies in our compensation peer group;

- the performance of each of our named executive officers, based on a qualitative assessment of his or her contributions to our overall performance, ability to lead his or her business unit or function, ability to collaborate across the company and potential to contribute to our long-term financial, operational and strategic objectives;

192.    As to Brougher's compensation, the 2020 Proxy Statement stated:

Françoise Brougher received an RSU award with a grant date fair value of $21.4 million which vests quarterly over five years as described under the "2019 Grants of Plan-Based Awards Table" below. This award was granted by the board in 2019 after considering her past performance, expected future contributions and the criticality of her role to Pinterest, and expected contributions, as well as the total unrealized value of her outstanding equity awards and their vesting terms relative to our compensation peer group data and other Pinterest executives.

193.    The 2020 Proxy Statement failed to disclose that Brougher's compensation arrangements were disparately different from her male counterparts due to her gender and that Brougher received substantially less compensation on less favorable terms than male officers. These awards were not reflective of her performance or contribution to Pinterest, despite statements in the 2020 Proxy Statement to the contrary.

194.    Furthermore, the 2020 Proxy Statement misleadingly stated that "Françoise Brougher *left* the Company effective April 7, 2020 and Todd Morgenfeld, our Chief Financial Officer, assumed her responsibilities []" and failed to disclose that Brougher was wrongfully terminated after voicing concerns of harassment and gender pay discrimination. (Emphasis added.)

195.    The 2020 Proxy Statement further stated in relevant part:

**diversity.** The governance committee seeks candidates representing a diversity of occupational and personal backgrounds, knowledge, skills and viewpoints so that the board provides effective oversight of the management of the company. The governance committee reviews the board's effectiveness in balancing these considerations when assessing the composition of the board.

196.    Finally, the 2020 Proxy Statement contained the following "Audit Committee Report," on behalf of Defendants Reynolds, Kilgore, and Wilson, who comprised the Audit Committee at that time:

The audit committee has reviewed and discussed with management the audited financial statements for the fiscal year ended December 31, 2019. The audit committee has discussed with EY, our independent registered public accounting firm, the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board ("PCAOB"), including Auditing Standard No. 1301, Communications with Audit Committees, as adopted by the PCAOB, and the SEC. The audit committee has also received the written disclosures and the letter from EY required by applicable requirements of the PCAOB regarding the firm's communications with the audit committee concerning independence and has discussed with EY the firm's independence. Based on the foregoing, the audit committee has recommended to the board that the audited financial statements be included in our 2019 annual report on Form 10-K.

197. The statements contained in the 2020 Proxy Statement were materially false and highly misleading since the Board failed to disclose, *inter alia*, that the Individual Defendants, and particularly, the Nominating and Corporate Governance Committee did not have a goal of increasing the gender or racial diversity of applicants for Board seats or the number of women or racially diverse members of the Board. Despite allegedly considering diversity, in the board composition and selection process, the truth is that Pinterest had no Black or other underrepresented ethnic minority members on its Board until just recently. Therefore, the unrevealed reality is that Pinterest may try to incorporate female, Black or other culturally/racially diverse candidates in its director nominee pool but had no actual intent to nominate female, Black or other culturally/racially diverse candidates to its Board or the Company endeavored to obstruct the nomination of female, Black or other culturally/racially diverse candidates in the pool. Either way, it is evident that gender and racial diversity was not among the relevant factors which the Nominating and Corporate Governance Committee considered with respect to determining Board nominees until the Individual Defendants' were forced to refresh the Board.

198. Moreover, the 2020 Proxy Statement was also materially false and misleading because it failed to disclose that the Company does not have term limits for its Board members, and that the purpose of the lack of term limits is to cement the current directors in position and

inhibit female, and Black or other racially diverse individuals from having adequate prospects to be nominated and elected to the Company's Board.

199.    The Individual Defendants' failure to embrace director term limits and to add new members, including women, Black, Hispanic, or other underrepresented individuals, to Pinterest's Board until only recently in response to significant public pressure represents explicit or implicit racism and bias at the Company, and an improper cause for failing to include women, Black, Hispanic, or other underrepresented individuals as members of the Company's Board.

200.    The 2020 Proxy Statement also failed to disclose that the Company's internal controls were inadequate to protect women, Black, Hispanic, and other underrepresented individuals from discrimination in its Board nomination process and Pinterest's appointment process to the Company's executive management team. Moreover, the 2020 Proxy Statement failed to disclose that the Individual Defendants failed to maintain internal controls, and failed to appoint an effective independent auditor to evaluate these controls, to ensure that the Company's stated policies regarding diversity and providing a workplace free of discrimination were being complied with.

201.    The 2020 Proxy Statement also failed to disclose, *inter alia*, that (1) the Company had engaged in the Discriminatory Misconduct; (2) that Brougher had been illegally terminated for voicing concerns of discrimination; (3) the Company does not have term limits due to a desire to keep Black and other underrepresented  individuals off of the Board; (4) the Company's Nominating and Corporate Governance Committee did not actually consider diversity when nominating Board candidates; (5) the independent auditor the Company repeatedly reselected to evaluate its internal controls was neither independent nor effective at ensuring the adequacy of the Company's internal controls; and (6) the Company failed to maintain adequate internal controls.

As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders, *inter alia*, elected three directors, who were allowing the illegal and discriminatory practices to continue and who were breaching their fiduciary duties to the Company; this further entrenched them in a Board free of term limits and led to the Company losing out on profits. As a further result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders ratified the selection of Ernst & Young as independent auditor, despite its not being independent and its failing to identify the inadequate internal controls to protect female, Black, and other underrepresented minority individuals from discrimination, as the Company's independent auditor for fiscal year 2020.

### The Individual Defendants Have Breached Their Duties by Rehiring Ernst & Young as the Company's Auditor Even Though Ernst & Young Has Failed to Perform its Job

202.     Ernst & Young labelled the Company's internal controls as adequate even as the Company included false and misleading statements in its 2020 Proxy Statements. Despite this, the Board, and in particular the Audit Committee, continued to vouch for, *inter alia*, the adequacy of the Company's internal controls, the performance of Ernst & Young as independent auditor, and Ernst & Young's independence. However, Ernst & Young has been the Company's independent auditor since 2013 during which time the Company has paid Ernst & Young multiple millions of dollars, including, as disclosed in the 2020 Proxy Statement, $5.3 million for fiscal year 2019 and $1.4 million for fiscal year 2018. The duration of this relationship, Ernst & Young's interest in continuing to receive such large fees, and the ongoing failure of Ernst & Young to properly audit and assess the Company's inadequate internal controls demonstrate its lack of independence and failure to effectively perform its role. The Audit Committee Defendants (defined below) are responsible for selecting and monitoring Ernst & Young and have therefore breached their fiduciary duty by failing to ensure that an adequate audit was being performed of the Company's

internal controls regarding diversity and antidiscrimination. The Board's, and the Audit Committee's, renomination of Ernst & Young to this role is thus a breach of the Individual Defendant's fiduciary duties.

## DAMAGES TO PINTEREST

203.    As a direct and proximate result of the Individual Defendants' conduct, Pinterest will lose and expend many millions of dollars.

204.    Such expenditures include, but are not limited to, legal fees and the $22.5 million settlement associated with Brougher's lawsuit filed against the Company, other payments made to resolve Ozoma's and Banks' actions against the Company, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

205.    Such expenditures also include, but are not limited to, legal fees associated with the Securities Class Action filed against, among others, the Company and the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

206.    Such expenditures include, but are not limited to, costs associated with the costs of defending potential investigations of the Discriminatory Misconduct and the loss of advertising business and revenue, and the loss of talent due to the Company's engagement in the Discriminatory Misconduct.

207.    Moreover, these expenditures include fees paid to Ernst & Young for its independent auditing services, when it was not independent and when it provided inadequate services considering the failure to identify the inadequate internal controls and to prevent false and misleading statements being included in the Company's SEC filings.

208.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to certain of the Individual Defendants who breached their fiduciary duties to the Company.

209.     As a direct and proximate result of the Individual Defendants' conduct, Pinterest has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

210.     Plaintiff brings this action derivatively and for the benefit of Pinterest to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Pinterest, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, as well as the aiding and abetting thereof.

211.     Pinterest is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

212.     Plaintiff is, and has been at all relevant times, a shareholder of Pinterest.  Plaintiff will adequately and fairly represent the interests of Pinterest in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

213.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

214.    A pre-suit demand on the Board of Pinterest is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following ten individuals: Defendants Silbermann, Sharp, Jordan, Kilgore, Levine, Rajaram, Reynolds, and Wilson (the "Director-Defendants") and non-parties Salaam Coleman Smith and Andrea Wishom (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten directors who are on the Board at the time this action is commenced.

215.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts relating to, *inter alia*, Pinterest's market standing and growth capabilities, the actualized risks the Company was currently facing, and the Discriminatory Misconduct, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

216.    Demand is also excused as to all of the Director-Defendants because the Discriminatory Misconduct was an unlawful business strategy that the Company engaged in and was not a valid exercise of business judgment, as it was based on bad faith and intentional, reckless, or disloyal misconduct. As the ultimate decision-making body of the Company, the Board made and/or allowed the Company to engage in the schemes outlined herein.

217.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the

Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

218.    The Director-Defendants knew of the falsity of the misleading statements at the time they were made. Because Pinterest heavily relied on its domestic active user base to generate revenues, thus core operations, the Company would have been materially affected by reaching its maximum capacity within that market. These facts support an inference of scienter as to Pinterest's Director-Defendants, charged with overseeing the Company's affairs. It is reasonable to infer that the Director-Defendants, as Board members of Pinterest, all must have had knowledge of information pertaining to Pinterest's core operations and the material events giving rise to these claims.

219.    Demand is also excused as to the Director-Defendants because they were fully aware of the Discriminatory Misconduct throughout the Relevant Period. Nonetheless, the Director-Defendants enabled and engaged in the misconduct and caused the Company to engage in it and disseminated the false and misleading statements described herein. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

220.    The Director-Defendants are further controlled by and beholden to Defendants Silbermann, Sharp, Levine, and Jordan, co-founders and associates of the Company's early investors, Bessemer and Andreessen Horowitz. These directors collectively own more than 67% of the voting power at the Company. As the Company recognizes, these directors, through their ownership of Class B common stock, are entitled to ***20 times*** the voting power per share as holders of Class A common stock. Specifically, as of March 31, 2020, Defendant Silbermann held 24.7% of total voting power, Defendant Sharp held 4.82%, Bessemer held 19.05%, and Andreessen Horowitz held 13.43% of the total voting power at the Company. The Company's dual-class

structure admittedly concentrates control over the Company with a limited group of shareholders. Even the Company's co-founder, Sciarra, who left the Company in 2012, controls 20.51% of the total voting power. Thus, these individuals retain significant control over the Company, irrespective of their positions on the Board; in Defendant Silbermann's case, his control extends beyond his own lifetime.

221.     Defendants Jordan and Levine serve as members of the Nominating and Corporate Governance Committee, and therefore have the authority to provide Defendant Silbermann whomever he chooses for director nominees. Likewise, Defendants Silbermann, Sharp, Jordan, and Levine could also impact which Director-Defendants would remain on the Board. The dual-class voting structure implemented at Pinterest has received criticism for inhibiting effective governance, oversight, and accountability. The control Defendant Silbermann has over the Director-Defendants is evident, as the Director-Defendants allowed systemic racism and sexism to permeate the Company. In the face of disparate pay arrangements, the Director-Defendants provided their approvals. When Defendant Brougher was wrongfully terminated, the Director-Defendants made no attempt to reach her or investigate the circumstances behind her removal. Defendant Brougher expressed her surprise that no one from the Board contacted her after her termination, as was common diligent practice in other reputable companies she had been a part of. At no point did the Director-Defendants exercise their oversight duties to investigate the widespread claims related to the Discriminatory Misconduct, question Brougher's absence at meetings after the IPO, or hire independent consultants to assist them in monitoring the Company's compliance and governance practices. Their deference and inactivity further supports their inability to approach any demand against the Director-Defendants that control them with independence or disinterestedness.

222.    Additional reasons that demand on Defendant Silbermann is futile follow.
Defendant Silbermann is the co-founder and current CEO of Pinterest and has served in such
capacity and as the Chairman of the Company's Board since 2011. Thus, as the Company admits,
he is a non-independent director. The Company provides Defendant Silbermann with his principal
occupation, and he has received and continues to receive handsome compensation as detailed
above. Defendant Silbermann personally made, signed, and/or signed SOX certifications for the
false and misleading statements in the Company's SEC filings regarding Pinterest's domestic
market and growth prospects. Moreover, Defendant Silbermann personally engaged in and
perpetuated the Discriminatory Misconduct. As described herein, Defendant Silbermann was
informed by multiple employees on several occasions about gender and race-based discrimination
and harassment occurring at his Company. Yet, he failed to take any meaningful action to prevent
or correct it. Instead, he was an active participant in the misconduct. He tacitly approved the
harassment of his own employees, including Ozoma, Banks, and Brougher and he wrongfully
terminated Brougher. Defendant Silbermann surrounded himself with a clique of yes-men and
shirked his duties to the Company and to his employees. Once Pinterest's toxic culture was
publicly exposed, he admitted that he had failed. Because Silbermann is Pinterest's CEO, he was
in a unique position to create actualized change to the Company's and the Board's diversity and
inclusion.[8] Yet, as an officer and director, he conducted little, if any, oversight of the
Discriminatory Misconduct, even when confronted with it on numerous occasions. Rather,
Defendant Silbermann engaged in and permitted the misconduct, despite being aware of it. He
further perpetuated the Company's engagement in the scheme to make false and misleading

---

[8]   https://corpgov.law.harvard.edu/2019/04/03/driving-diversity-and-inclusion-the-role-for-chairs-and-ceos/. Last visited December 8, 2020.

statements in relation thereto. The Company provides Silbermann with his primary occupation and means of livelihood, it is unlikely he would entertain a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining his compensation and evaluating his continued employment with Pinterest. Defendant Silbermann is also a named defendant in the Securities Class Action and the subject of the employee complaints and lawsuits discussed herein and widely in the public sphere. Thus, demand upon Defendant Silbermann is not independent or disinterested, and thus demand upon him is futile and, therefore, excused

223.    Additional reasons that demand on Defendant Sharp is futile follow. Defendant Sharp co-founded the Company and has served as a Company director since 2019. He also serves as Pinterest's Chief Design and Creative Officer. Like Defendant Silbermann, the Company provides Defendant Sharp with his primary occupation and he has received and continues to receive handsome compensation for his role as detailed above. As the Company recognizes, Defendant Sharp is not independent due to, *inter alia*, his executive position at the Company. Defendant Sharp was aware of and enabled the Discriminatory Misconduct. He was directly informed that people of color at the Company distrusted human resources. Yet, he failed to take any meaningful action. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, the Discriminatory Misconduct, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Sharp breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

224.    Additional reasons that demand on Defendant Jordan is futile follow. Defendant Jordan has served as a Company director since 2011. He also serves as a member of the Nominating and Corporate Governance Committee. Defendant Jordan has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the schemes to make and to cause the Company to make false and misleading statements and to fail to correct them, the Discriminatory Misconduct (which Defendant Jordan engaged in and permitted despite being aware of it), consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Jordan is also a managing partner at Andreessen Horowitz, one of the Company's largest shareholders, and has a history of beneficial relationships with the Company and the Individual Defendants. One of the founders of Andreessen Horowitz engaged in the misconduct discussed herein in January 2020 during a Company fire side chat. Defendant Jordan is unlikely to entertain any demand implicating his firm or the other Individual Defendants with which he has had long-standing beneficial relationships with. For these reasons, Defendant Jordan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

225.    Additional reasons that demand on Defendant Kilgore is futile follow. Defendant Kilgore has served as a Company director since 2019 and serves as a member of the Audit Committee and Compensation Committee. Defendant Kilgore has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the schemes to make and to cause the Company to make false and misleading statements and to fail to correct them, the Discriminatory Misconduct (which

Defendant Kilgore engaged in and permitted despite being aware of it), consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Kilgore breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

226.    Additional reasons that demand on Defendant Levine is futile follow. Defendant Levine has served as a Company director since 2011. He also serves as Chair of the Nominating and Corporate Governance Committee. Defendant Kilgore has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the schemes to make and to cause the Company to make false and misleading statements and to fail to correct them, the Discriminatory Misconduct (which Defendant Levine engaged in and permitted despite being aware of it), consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Levine is also a partner at Bessemer and has a history of beneficial relationships with the Company and the Individual Defendants. For these reasons, Defendant Levine breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

227.    Additional reasons that demand on Defendant Rajaram is futile follow. Defendant Rajaram has served as a Company director since 2020. He also serves as a member of the Nominating and Corporate Governance Committee.  As a trusted Company director, he conducted little, if any, oversight of the schemes to make and to cause the Company to make false and misleading statements and to fail to correct them, the Discriminatory Misconduct (which

Defendant Rajaram engaged in and permitted despite being aware of it), consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Rajaram breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

228.    Additional reasons that demand on Defendant Reynolds is futile follow. Defendant Reynolds has served as a Company director since 2017. He also serves as Chair of the Audit Committee.  As a trusted Company director, he conducted little, if any, oversight of the schemes to make and to cause the Company to make false and misleading statements and to fail to correct them, the Discriminatory Misconduct (which Defendant Reynolds engaged in and permitted despite being aware of it), consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Reynolds breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

229.    Additional reasons that demand on Defendant Wilson is futile follow. Defendant Wilson has served as a Company director since 2016. She also serves as Chair of the Compensation Committee and as a member of the Audit Committee.  As a trusted Company director, she conducted little, if any, oversight of the schemes to make and to cause the Company to make false and misleading statements and to fail to correct them, the Discriminatory Misconduct (which Defendant Wilson engaged in and permitted despite being aware of it), consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Wilson breached

her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

230.    Additional reasons that demand on the Board is futile follow.

231.    Defendants Reynolds, Kilgore and Wilson (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, Pinterest's disclosure controls and procedures, system of internal controls, the appointment and oversight of the Company's independent auditor, Pinterest's financial risk exposures, and "Pinterest's compliance with applicable legal and regulatory requirements and Pinterest's enterprise risk management program." The Audit Committee Defendants were also responsible for reviewing and overseeing the preparation of the Company's proxy statement and quarterly and annual financial statements.  Significantly, the Audit Committee Defendants were responsible for "overseeing legal and regulatory matters that have a material impact on Pinterest's financial statements and reviewing and approving the adequacy and effectiveness of Pinterest's compliance policies and procedures, including the Code of Conduct & Ethics." The Audit Committee Defendants utterly failed to monitor the state of the Company's compliance and the effectiveness of the Company's policies and compliance with the Code of Conduct as evinced by the long-standing Discriminatory Misconduct. They further failed to ensure the integrity of the Company's accounting and financial reporting processes and internal controls as well as failing to ensure that the Company had an effective independent auditor to evaluate the internal controls as they are charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them. The Audit Committee

Defendants failed in their oversight duties, reflecting clear deficiencies in the Company's ability to adequately implement or oversee its internal controls.

232.    Defendants Jordan, Levine, and Rajaram (the "Nominating and Corporate Governance Committee Defendants") served as members of the Nominating and Corporate Governance Committee during the Relevant Period. Pursuant to the Company's Nominating and Corporate Governance Committee Charter, the Nominating and Corporate Governance Committee Defendants are responsible for, among other things, identifying individuals qualified to become members of the Board, selecting the director nominees, and developing a set of corporate governance principles for the Company. The Nominating and Corporate Governance Committee Defendants engaged or permitted the Company to engage in the Discriminatory Misconduct. Thus, the Nominating and Corporate Governance Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

233.    Defendants Kilgore and Wilson (the "Compensation Committee Defendants") served as members of the Compensation Committee and regularly approved disparate pay arrangements that favored Pinterest's male employees over its female employees at the highest levels. In this way, the Compensation Committee Defendants engaged in the Discriminatory Misconduct and failed to take action to correct or prevent it. The Compensation Committee Defendants were also responsible for overseeing Pinterest's compliance with its Code of Conduct and relevant laws and regulations. They failed to uphold their responsibilities and allowed the Individual Defendants to discriminate against Pinterest's employees on the basis of sex and/or race. Thus, the Compensation Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

234.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  For instance, Defendant Rajaram serves as an executive of DoorDash. Andreessen Horowitz is an investor in DoorDash and in Caviar, its subsidiary, which is led by Defendant Rajaram. Defendant Rajaram also serves on the board of Coinbase with another Andreessen Horowitz affiliate, Marc Andreessen. Ben Horowitz, who made improper statements to Pinterest employees in January 2020, serves on the board of Okta with Defendant Wilson. Defendant Kilgore and non-party Wishom also serve together on the Board of Nextdoor. Defendant Rajaram, Sharp and Sharp's wife all served at Facebook during the time period. Defendants Silbermann and Rajaram served at Google during the same time period. Defendants Wilson and Kilgore served together at Amazon. While Defendant Kilgore served on the board of LinkedIn, Defendant Levine led Bessemer's Series C investment in the Company. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

235.    In violation of the Code of Conduct, the Nominating and Corporate Governance Committee Charter, the Audit Committee Charter, the Compensation Committee Charter, and Pinterest's Corporate Governance Guidelines, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to engage in the Discriminatory Misconduct, make and cause the Company to make, and to fail to correct, materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of

the Exchange Act. In violation of Pinterest's governance documents and principles, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct, among other failings. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

236.    The false statements detailed herein in the Proxy Statements and the failure to establish term limits allowed for the Board to entrench itself and to continue to engage in the Discriminatory Misconduct, which resulted in not only a breach of the directors' duties to the shareholders, but also resulted in lost profits for the Company. Therefore, demand on each of the Director-Defendants is excused.

237.    Pinterest has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Pinterest any part of the damages Pinterest suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

238.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's bylaws. As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment

about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

239.    The acts complained of herein constitute violations of fiduciary duties owed by Pinterest 's officers and directors, and these acts are incapable of ratification.

240.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Pinterest. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Pinterest, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

241.    If there is no directors' and officers' liability insurance, then the Directors will not cause Pinterest to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

242.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

243.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

244.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

245.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

246.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

247.   Under the direction and watch of the Individual Defendants, the 2020 Proxy Statement failed to disclose that: (1) the Company had engaged in the Discriminatory Misconduct; (2) that Brougher had been illegally terminated for voicing concerns of discrimination; (3) the Company does not have term limits due to a desire to keep Black and other underrepresented individuals off of the Board; (4) the Company's Nominating and Corporate Governance Committee did not actually consider diversity when nominating Board candidates; (5) the independent auditor the Company repeatedly reselected to evaluate its internal controls was neither independent nor effective at ensuring the adequacy of the Company's internal controls; and (6) the Company failed to maintain adequate internal controls.

248.   The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose the Discriminatory Misconduct and that the Company's compensation policies and procedures were utilizes in a disparate manner to discriminate against employees who were Black and/or female. The 2020 Proxy Statement also misrepresented the circumstances surrounding Brougher's departure.

249.   Moreover, the 2020 Proxy Statement was false and misleading when it discussed the Company's Code of Conduct, due to the Individual Defendants' failure to abide by the Code of Conduct, and their engagement in or the tolerance of the Discriminatory Misconduct and the schemes to issue false and misleading statements and omissions of material fact relating to the Discriminatory Misconduct.

250.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and

omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including, but not limited to, election of directors, the ratification of the selection of Ernst & Young as independent auditor, and the proposal regarding the frequency of advisory voting on executive compensation.

251.    The false and misleading elements of the 2020 Proxy Statement led to, *inter alia*, the re-election of Defendants Jordan, Levine, and Rajaram, which allowed them to continue breaching their fiduciary duties to Pinterest.

252.    The false and misleading elements of the Proxy Statements led to the shareholder ratification of Ernst & Young as the Company's independent auditor, when Ernst and Young was neither independent nor effective in ensuring the adequacy of the Company's internal controls.

253.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2020 Proxy Statement.

254.    Plaintiff on behalf of Pinterest has no adequate remedy at law.

## SECOND CLAIM

**Against Defendants Silbermann, Morgenfeld, Jordan, Kilgore, Levine, Reynolds, Sharp, and Wilson for Breach of Fiduciary Duties Related to Misrepresentations Regarding Pinterest's Domestic Market**

255.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

256.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Pinterest's business and affairs.

257.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

258.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Pinterest.

259.    In breach of their fiduciary duties owed to Pinterest, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact that failed to disclose that: (1) Pinterest's domestic market in the United States was nearly saturated; (2) the Company's potential to capitalize on the average revenue for each domestic-based user was thereby substantially diminished; (3) consequently, Pinterest faced a heightened risk for losing revenues from; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading.

260.    The Individual Defendants further failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact.

261.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

262.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Pinterest's securities.

263.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to

maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Pinterest's securities.

264.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

265.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Pinterest has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

266.    Plaintiff on behalf of Pinterest has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties
Related to the Discriminatory Misconduct**

267.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

268.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Pinterest's business and affairs.

269.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

270.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Pinterest.

271.     In further breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in the Discriminatory Misconduct.

272.     In breach of their fiduciary duties owed to Pinterest, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose the Discriminatory Misconduct.

273.     The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

274.     Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

275.     The Individual Defendants also breached their fiduciary duties by reselecting Ernst & Young as their independent auditor when Ernst & Young failed to properly audit and assess the Company's inadequate internal controls.

276.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements relating to the Discriminatory Misconduct, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose

and effect of artificially inflating the price of Pinterest 's securities, and disguising insider transactions.

277.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, to fail to maintain internal controls, and to reappoint Ernst & Young as independent auditor despite its being neither independent nor effective. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of engaging in and concealing the Discriminatory Misconduct and thereby artificially inflating the price of Pinterest's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

278.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

279.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Pinterest has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

280.    Plaintiff on behalf of Pinterest has no adequate remedy at law.

## **FOURTH CLAIM**

### **Against the Individual Defendants for Unjust Enrichment**

281.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

282.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Pinterest.

283.     The Individual Defendants either benefitted financially from the improper conduct, including through insider sales, or received bonuses, stock options, or similar compensation from Pinterest that was tied to the performance or artificially inflated valuation of Pinterest, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

284.     Plaintiff, as a shareholder and a representative of Pinterest, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

285.     Plaintiff on behalf of Pinterest has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Abuse of Control

286.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

287.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Pinterest, for which they are legally responsible.

288.     As a direct and proximate result of the Individual Defendants' abuse of control, Pinterest has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Pinterest has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

289.     Plaintiff on behalf of Pinterest has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

290.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

291.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Pinterest in a manner consistent with the operations of a publicly-held corporation.

292.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Pinterest has sustained and will continue to sustain significant damages.

293.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

294.     Plaintiff on behalf of Pinterest has no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

295.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

296.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Pinterest to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions and to lose financing from investors and business from future customers who no longer trust the Company and its products.

297.   In addition, the Individual Defendants wasted corporate assets by paying many millions of dollars in fees to Ernst & Young as independent auditor, when Ernst & Young was neither independent nor effective at ensuring the adequacy of the Company's internal controls.

298.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

299.   Plaintiff on behalf of Pinterest has no adequate remedy at law.

## EIGHTH CLAIM

**Against Defendants Silbermann and Morgenfeld for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

300.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

301.   Pinterest, along with Defendants Silbermann and Morgenfeld are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Silbermann and Morgenfeld's willful and/or reckless violations of their obligations as officers and/or directors of Pinterest.

302.   Defendants Silbermann and Morgenfeld, because of their positions of control and authority as officers and/or directors of Pinterest, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Pinterest, including the wrongful acts complained of herein and in the Securities Class Action.

303.   Accordingly, Defendants Silbermann and Morgenfeld are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange

Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

304.    As such, Pinterest is entitled to receive all appropriate contribution or indemnification from Defendants Silbermann and Morgenfeld.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Pinterest, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Pinterest;

(c)    Determining and awarding to Pinterest the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Pinterest  and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Pinterest  and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Pinterest to nominate at least five

candidates for election to the Board, which should include at least four underrepresented individuals;

    3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

    4. a proposal to ensure the publication of an annual Diversity Report that contains particularized information about the hiring, advancement, promotion, retention and pay equity of all minorities at Pinterest;

    5.  a proposal to establish a fund to hire Black individuals and other minorities, promote Black individuals and other minorities to more management positions at the Company, establish and maintain a mentorship program at Pinterest for Black individuals and other minorities that is committed to providing the skills and mentorship necessary to succeed at the Company;

    6.  a proposal to establish and require annual training of Pinterest 's entire Board and all executive officers, which training should at a minimum focus on diversity, sexual harassment, antidiscrimination, and affirmative action, as well as other relevant topics; and

    7.  a proposal to adopt a revised executive compensation program that ties 30% of executives' compensation to the achievement of certain specified diversity goals.

    8.  a proposal to replace Ernst & Young as the Company's independent auditor.

    (e)    Awarding Pinterest restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

Dated: February 9, 2021                    Respectfully submitted,

                                           **FARNAN LLP**

                                           /s/ Michael J. Farnan
                                           Brian E. Farnan (Bar No. 4089)
                                           Michael J. Farnan (Bar No. 5165)
                                           919 N. Market St., 12th Floor
                                           Wilmington, DE 19801
                                           Telephone: (302) 777-0300
                                           Facsimile: (302) 777-0301
                                           Email: bfarnan@farnanlaw.com
                                                   mfarnan@farnanlaw.com

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net